BIRDSALL
LAW OFFICES, S.C.

Attorney John A. Birdsall

April 15, 2019

Honorable Pamela Pepper
United States District Court
517 E. Wisconsin Ave
Room 225
Milwaukee, WI 53202

      Re:    United States of America v. Orlando Medina, a/k/a, "Alejandro Pagan-Ortiz"
             EDWI Case No. 15CR16

Dear Judge Pepper:

## INTRODUCTION

      This is a brief outline regarding Orlando Medina's character for your consideration at his sentencing hearing on Monday, April 8, 2019. The government will likely be recommending what they perceive as the mandatory minimum of ten (10) years. For the reasons stated below, we believe that only the mandatory minimum of five (5) years applies in this case under both the First Step Act and the *Elder* decision.

      On March 6, 2018, Mr. Medina was found guilty of Conspiracy to Distribute 500 Grams or More of Cocaine under 21 U.S.C. § 841(a)(1). Under the facts and legal argument detailed below, we believe that a sentence of **five years, the mandatory minimum,** is the legally correct punishment for this offense.

      What follows is a brief explanation of Mr. Medina's background and character, as well as a legal discussion that supports our sentencing recommendation. I hope that these materials are helpful to you in determining the ultimate resolution of this matter for Mr. Medina.

## BACKGROUND

      Orlando Medina was born to Alejandro Pagan and Alieda Ortiz on August 14, 1976. Raised predominantly by his mother and grandmother, Mr. Medina grew up in Barceloneta, Puerto Rico where he and his family suffered from extreme poverty. They relied heavily on government benefits and assistance from family members throughout his childhood. Because of embarrassment due to learning deficiencies,

1110 N Old World 3rd St., Suite 218 • Milwaukee, WI 53203
www.birdsall-law.com • Phone: (414) 831-5465 • Facsimile: (414) 831-5468
Email: jbirdsall@birdsall-law.com

Case 2:15-cr-00016-PP   Filed 04/15/19   Page 1 of 7   Document 113

Mr. Medina stopped attending school after the 4th grade and never received a high school diploma or GED. Growing up in Barceloneta, Mr. Medina witnessed a multitude of crime and substance abuse.

Mr. Medina thinks the world of his mother for guiding him through a turbulent and troublesome childhood. Prior to the instant matter, Mr. Medina took care of his mother who is now 71 years old and suffers from a combination of diabetes and high blood pressure. Mr. Medina assisted his mother with her medication and took her to her medical appointments. The current situation causes a great deal of stress for Mr. Medina as he worries what will happen to his mother in his absence and feels terrible for this absence.

For the past 12 years, Mr. Medina has been in a loving, committed relationship with girlfriend Ericka Cordero, who Mr. Medina plans to marry sometime in the future. Ms. Cordero recently relocated to Meriden, Connecticut, with their two children, Angeliz, 13, and Yairelis, 8, in hopes of a better life and improved medical care for Yairelis, who suffers from autism. While Angeliz is the fruit of Ms. Cordero's previous relationship, Mr. Medina is the father figure for both children who have had difficulties coping with Mr. Medina's absence. Due to Mr. Medina's absence, Ms. Cordero and their children have struggled both financially and emotionally, with Yairelis requiring therapy to cope with Mr. Medina's incarceration.

Issues with substance abuse started early for Mr. Medina, having tried marijuana for the first time at 10 years old, drinking alcohol for the first time at 14 years old, and trying cocaine for the first time at 18 years old. These issues have persisted throughout Mr. Medina's adult life including struggles with alcoholism, daily marijuana use, and formerly, daily heroin use. Mr. Medina recognizes the need to stay sober so he can properly provide for his family.

### Mandatory Minimum Requirement

In ¶42 of the PSR, the writer identified a past Wisconsin conviction of Mr. Medina as a predicate offense under 21 U.S.C. § 841(b)(1)(A). For mandatory minimum purposes, "[a] state crime may qualify as a predicate conviction only if the elements of the state crime mirror, or are narrower than, the elements of the generic crime." *United States v. Zuniga-Galeana*, 799 F.3d 801, 804 (7th Cir. 2015) (per curiam). Because the elements of Mr. Medina's past conviction in Wisconsin are broader than the parallel elements of the corresponding federal statute, 21 U.S.C. § 841(b)(1)(A), Mr. Medina's Wisconsin conviction does not qualify as a predicate offense and he is subject only to a five-year mandatory minimum.

If a defendant has previously been convicted of a "serious drug offense[1]" and is now being sentenced for a conviction under 21 USCA § 841(b)(1)(A), an increase in the mandatory minimum sentence is required dependent on the number of previous serious drug offense convictions.

In *United States v. Elder*, the Seventh Circuit adopted the categorical approach to identify predicate offenses under 21 U.S.C. § 841(b)(1)(A) and section 802(44). 900 F.3d 491, 501 (2018). Under this approach, a sentencing court must determine whether a state statute of conviction is a categorical match to the corresponding federal statute. *Id.* at 498. The sentencing court will "focus solely on whether the elements of the crime of conviction sufficiently match the elements of [the crime referenced in the federal statute], while ignoring the particular facts of the case." *Mathis v. U.S.*, 136 S. Ct. 2243, 2248 (2016).

With the categorical approach comes its companion, the "modified" categorical approach, which permits the sentencing court to examine a limited class of record documents[2] if the state statute in question is divisible[3]. *Elder*, 900 F.3d at 502. The modified categorical approach is used as a "tool to 'implement the categorical approach' and a 'mechanism for making the [categorical approach's] comparison when a statute lists multiple, alternative elements.'" *Elder*, 900 F.3d at 502 (quoting *Descamps*, 570 U.S. at 263–64).

Using a hypothetical California burglary law, the Supreme Court of the United States illustrated effective use of the modified categorical approach:

> Suppose, for example, that the California law noted above had prohibited "the lawful entry or the unlawful entry" of a premises with intent to steal, so as to create two different offenses, one more serious than the other. If the defendant were convicted of the offense with unlawful entry as an element, then his crime of conviction would match generic burglary and count as an ACCA predicate; but, conversely, the conviction would not qualify if it were for the offense with lawful entry as an element. A sentencing court thus requires a way of figuring out which of the alternative elements listed—lawful entry or unlawful entry—was integral to the defendant's conviction (that is, which was necessarily found or admitted).

---

[1] A serious drug offense is defined as "an offense under State law[] involving… possessi[on] with intent to… distribute a controlled substance… for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 USCA § 924(e)(2)(A)(ii).

[2] Sentencing courts may consult "charging papers, jury instructions, and any available plea agreements or plea colloquies." *United States v. Edwards*, 836 F.3d 831, 835 (7th Cir. 2016).

[3] A statute is divisible if it "sets out one or more elements of the offense in the alternative," *Descamps v. U.S.*, 570 U.S. 254, 257 (2013), thereby defining multiple crimes.

3

*Mathis*, 136 S. Ct. at 2249. Using a limited class of documents, a sentencing court will determine what alternative elements a defendant was convicted under. *Id*. Once the elements are established, the sentencing court compares the state crime to the relevant federal statute, using the categorical analysis. *Id*.

The relevant state statute in this case is Wis. Stat. § 961.41(1m)(cm). The statute makes illegal the possession of "cocaine or cocaine base, or a controlled substance *analogue* of cocaine or cocaine base." Wis. Stat. § 961.41(1m)(cm) (2001-2002). The statute defines a controlled substance analogue as:

> …a substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance included in schedule I or II and:
>
> 1. Which has a stimulant, depressant, narcotic or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, narcotic or hallucinogenic effect on the central nervous system of a controlled substance included in schedule I or II[.]

Wis. Stat. § 961.01(4m)(a). Contrary to Wis. Stat. § 861.41(1m)(cm), 21 USCA § 841(b) does not explicitly reference controlled substance analogues. While, 21 USCA § 813(a) states that controlled substance analogues will be considered controlled substances in schedule I for purposes of Federal law, it is only to the extent *intended for human consumption*; a distinction not referenced in Wisconsin's relevant statutes.

Mr. Medina concedes that Wis. Stat. § 861.41 is divisible under *Mathis*; Wis. Stat. § 961.41 sets out alternative elements, specific controlled substances a defendant can be convicted of possessing, with each alterative element constituting a distinct crime with distinct penalties. Further, court documents will undoubtedly show that Mr. Medina was convicted under the subsection dealing specifically with cocaine, cocaine-base, and controlled substance analogs of cocaine or cocaine-base, § 961.41(1m)(cm).

The problem with Wis. Stat. § 961.41, and more specifically, § 961.41(1m)(cm), arises in its definition and treatment of controlled substance analogs when compared to the federal government's treatment of controlled substance analogues under §§ 813(a), 841(b), and 802(44). The federal treatment of analogues is narrower than the Wisconsin treatment because. Under federal law, controlled substance analogues are only considered controlled substances when they are intended for human consumption; In contrast, Wisconsin law makes no such distinction and defines analogues, for the purpose of controlled substance charges, only as a substance with (1) similar structure to a controlled substance and; (2) having an effect on the central

nervous system substantially similar to that of a controlled substance. The Wisconsin definition is not dependent on intentional human consumption of the substance as the federal definition is, making Wis. Stat. § 961.41(1m)(cm) broader than 21 USCA §§ 802(44) and consequentially, inapplicable as a predicate offense under § 841(b)(1)(A).

### Base Offense Level – PSR

In ¶25, the Presentence Investigation Report (PSR) writer, claims that Mr. Medina's base offense level should be 28 under USSG §2D1.1(c)(6)[4] based on Rodolfo Duenas' specious statements to police.[5] Specifically she states that

> "Mr. Duenas told law enforcement that he received at least five to seven packages from the defendant containing anywhere from .50 kilogram to 1 kilogram at a time. Thus, a conservative estimate would be that the defendant sent Mr. Duenas five packages containing 500 grams of cocaine each for a total of 2,500 grams of cocaine."

She then adds the amount involved in the actual transaction of this offense: 1,661.40 grams of cocaine - for a total of 4,161.40 grams. She concludes that subsection (c)(6) - and level 28 - is applicable. However, this Court, at a bench trial, found Mr. Duenas not remotely credible. Upon information and belief, the Court said, in ruling on the defense Rule 29 motion, that he "has a tenuous relationship with the truth."[6] The Court echoed that sentiment in its final ruling. While finding that the overall proof that Mr. Medina was guilty beyond a reasonable doubt when viewing the totality of the evidence on the actual charge in the Indictment, the Court specifically discussed Mr. Duena's lack of credibility and cited numerous instances where he directly contradicted himself and/or where he outright lied to the Court.

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact… that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *Jones v. United States*, 526 U.S. 227, 243, 119 S. Ct. 1215 (1999). While no longer mandatory, the Supreme Court of the United States has recognized the Federal Sentencing Guidelines' continued, central role in sentencing. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1341 (2016). The Guidelines are a federal court's "starting point and ... initial benchmark." *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586 (2007). Even though a sentencing judge may deviate from the Guidelines' suggested sentence, "'if [that] judge uses the

---

[4] Drug weights of "[a]t least 3.5 KG but less than 5 KG of Cocaine;"
[5] Importantly, she has not observed Mr. Duenas' trial testimony, as this Court has.
[6] The transcripts from the trial were ordered earlier this year but never prepared. They have been re-ordered.

sentencing range as the beginning point to explain the decision to deviate from it, *then the Guidelines are in a real sense the basis for the sentence.*" *Peugh v. United States*, 569 U.S. 530, 542, 133 S. Ct. 2072 (2013) (quotations omitted).

The most recent federal sentencing statistics demonstrate the "pervasive effect the Guidelines have on sentencing." *Molina-Martinez*, 136 S. Ct. at 1346. In only 20.1% of cases, did a sentencing judge impose a sentence below the Guidelines' range without government sponsorship. See USSC, 2017 Sourcebook of Federal Sentencing Statistics (Table N). It's clear that there is "considerable empirical evidence indicating that the Sentencing Guidelines have the intended effect of influencing the sentences imposed by judges." *Peugh*, 569 U.S. at 543.

Notwithstanding the Supreme Court's sentiments on the influence of the Sentencing Guidelines, the Seventh Circuit holds that a preponderance of the evidence is all that is necessary for a factual finding of drug quantity under the Guidelines. *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015). The Seventh Circuit further noted that "[s]o long as the evidence before the [district] court 'bears sufficient indicia of reliability to support its probable accuracy,' [the circuit court] will not disturb its findings. *United States v. Thurman*, 889 F.3d 365, 370 (7th Cir. 2018) (quoting *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007)).

In *Thurman*, the defendant was charged with distribution of 100 grams or more of heroin, based on a controlled buy. *Thurman*, 889 F.3d at 362. At sentencing the court held the defendant "responsible distributing between 700 grams and one kilogram of heroin," *Id.* at 363, based on the prior seizure of 498 grams of heroin from the defendant's co-conspirator, as well as the defendant's own statement that he previously distributed 800 grams of heroin to his co-conspirator prior to his arrest, *Id.* at 370. The court found that the seizure of 498 grams of heroin, corroborated by police surveillance, and the defendant's own statements against penal interest bore enough indicia of reliability to assure the information was accurate. *Id.* at 370. The circuit court also noted that the sentencing court declined to increase the drug quantity further based on the co-conspirator's *uncorroborated* testimony to the grand jury. *Id.*

Contrary to the sentencing court's determination in *Thurman*, here, there is not sufficient indicia of reliability to hold Mr. Medina accountable for more than the amount of cocaine recovered. Unlike *Thurman*, where the increased drug weight was calculated based on additionally seized drugs, corroborated by police surveillance, and the defendant's own statements, here, the only corroborating evidence to support an increased drug quantity are the statements of Rodolfo Duenas alone.

6

This Court cannot, and should not, rely on Mr. Duena's statements because it lacks any indicia of reliability. This Court has already found Mr. Duena's testimony incredible – even disturbingly so. Thus, it is incumbent on the government to demonstrate why the testimony (or conversely his divergent statements) should be believed. Though the judge may rely on the PSR, if the defendant furnishes some evidence that calls the PSR's correctness into question, the burden shifts to the government to demonstrate the accuracy of the information. *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010). It is further clear that the increased drug quantity described in the PSR should be disregarded because Duenas' statements are the *only* corroborating evidence to support the increase. Because the increased drug quantity is based solely on Duenas' incredulous statements, it is clear the preponderance of the evidence burden has not been met.

This court should, at most, consider only the drug amounts that Mr. Medina was found guilty of at trials, to wit, 1,661.40 grams of cocaine, with a base offense level of 24 under USSG §2D1.1(c)(6).

## Conclusion

For the reasons stated above, the Court, under Elder, should not consider Mr. Medina's prior conviction identified in ¶42 of the PSR and should sentence him to the five (5) year mandatory minimum required under the statute.

Thank you for your kind caonsideration and attention to this matter. Naturally, if you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

**BIRDSALL LAW OFFICES, S. C.**

*/s/ John A. Birdsall*
John A. Birdsall, Esq.
State Bar No. 1017786

JAB/