UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|  | ) | Case No. 16-CR-16 |
| Plaintiff, | ) | Milwaukee, Wisconsin |
|  | ) | |
| vs. | ) | April 22, 2019 |
|  | ) | |
| ORLANDO MEDINA, | ) | 1:51 p.m. |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

----------------------------------------------------------------

**TRANSCRIPT OF SENTENCING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:      United States Department of
                               Justice
                               By: Mario Gonzales
                               Office of the US Attorney
                               517 E Wisconsin Ave - Rm 530
                               Milwaukee, WI 53202
                               Ph: (414)297-4484
                               Fax: (414) 297-1738
                               Mario.Gonzales2@usdoj.gov

For the Defendant
ORLANDO MEDINA:                Birdsall Law Offices SC
(Present)                      By: John A Birdsall
                               1110 N Old World Third St- Ste 218
                               Milwaukee, WI 53203
                               Ph: (414) 831-5465
                               Fax: (414) 831-5468
                               JBirdsall@Birdsall-law.com

U.S. Probation Office:         Jennifer Morgan
Also Present:                  Alexandra Wirth

U.S. Official Transcriber:     SUSAN M. ARMBRUSTER, RMR
Transcript Orders:             Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1

2                    TRANSCRIPT OF PROCEEDINGS

3                  Transcribed From Audio Recording

4                          *    *    *

5          THE CLERK:  The Court calls criminal case 15-CR-16,

6   United States versus Orlando Medina.  Please state your

7   appearances for the record starting with counsel for the

8   Government.

9          MG. GONZALES:  Assistant United States Attorney Mario

10  Gonzales appears on behalf of the Government.  Also seated at

11  counsel's table, HIDTA Task Force Agent Evelyn Lazo.

12         THE COURT:  Good afternoon.

13         MR. BIRDSALL:  Attorney John Birdsall on behalf of

14  Mr. Pagan, who appears in person.  Good afternoon.

15         PROBATION AGENT:  Good afternoon, Your Honor.

16  Jennifer Morgan from probation.

17         INTERPRETER:  Good afternoon.  Federal Interpreter

18  Alexandra Wirth.

19         THE COURT:  Good afternoon.

20     (Whereupon the interpreter was sworn in.)

21         INTERPRETER:  Your Honor, so I can indicate so the

22  Court doesn't ask me questions, that he prefers me to be standby

23  interpreter, and I will assist him in all his needs.

24         THE COURT:  Thank you, Ms. Wirth.  I would note for

25  the record as some of us recall that awhile back at the

2

1    beginning of this case, Mr. Birdsall had a number of documents

2    that he needed assistance in having translated.  Ms. Wirth

3    helped him with that.  When we went to try to find an

4    interpreter for today's hearing, we discovered that interpreters

5    are busy people, and they are all booked up.  And we reached out

6    to Ms. Wirth, and I think she reminded us of the fact that she

7    had worked directly for Mr. Pagan and Mr. Birdsall, and asked if

8    there would be any problem with that or if that were a conflict.

9    We contacted Mr. Gonzales.  My understanding is Mr. Gonzales

10   said he did not have a problem with Ms. Wirth acting as the

11   interpreter today.  Is that right, Mr. Gonzales?

12          MG. GONZALES:  That is correct.  I've worked on other

13   cases with Ms. Wirth, and I know that she is an equal

14   opportunity interpreter.  She points out negatives for the

15   Government as well as for the defense, so I feel confident in

16   her handling any hearing that I'm involved in.

17          THE COURT:  Thank you.  That's my feeling as well.  So

18   thank you for helping us out, Ms. Wirth.

19          All right.  We're here today for Mr. Pagan's

20   sentencing after what I imagine seems to Mr. Pagan to be a

21   virtual lifetime.  I have several documents on the docket.

22   First, I have the Presentence Report, which was filed on the

23   15th of April.  That's Docket No. 110.  That's the revised one.

24   I also have an addendum to that report, which contains Mr.

25   Birdsall's objection.  A separate objection is also docketed in

3

1  the docket, but I'm just going to be referring to the addendum

2  because that has all of the information in it, including

3  probation's response and the Government's response.  That's at

4  Docket No. 111.

5        And in addition, Mr. Birdsall has filed a Sentencing

6  Memo, Docket No. 113, which also contains some separate

7  arguments from those he made in the objections.  Mr. Gonzales,

8  any other documents that you're aware of that I should have

9  mentioned?

10        MG. GONZALES:  No, Your Honor.

11        THE COURT:  Ms. Morgan, do you know of any others that

12  probation received that I didn't mention?

13        PROBATION AGENT:  No, Your Honor.

14        THE COURT:  All right.  And Mr. Birdsall, I've covered

15  everything?

16        MR. BIRDSALL:  Yes, Judge.

17        THE COURT:  Then Mr. Gonzales, can the Government

18  think of any reason why we should not proceed to sentencing

19  today?

20        MG. GONZALES:  No, Your Honor.

21        THE COURT:  Mr. Birdsall, any reason from the defense?

22        MR. BIRDSALL:  No, Judge.

23        THE COURT:  All right.  Mr. Pagan, let me tell you how

24  we're going to proceed this afternoon.  The first thing we're

25  going to do is that there's a legal issue that Mr. Birdsall has

1    raised about what the mandatory minimum sentence should be.   And

2    I'm going to talk with the lawyers about that.   I'm going to

3    have to make a decision in that regard.

4            Then, I'm also going to talk with the lawyers.   They

5    disagree with each other about what the sentencing guidelines

6    ought to be, so I'm going to talk with them about those

7    disagreements and work those out.   And once I figure out what

8    the mandatory minimum sentence is and what the sentencing

9    guidelines are, I then need to hear from the attorneys about

10   what they think the right sentence should be because I don't

11   have to follow the guidelines, as I think Mr. Birdsall's

12   probably told you.

13           So I'm going to start with Mr. Gonzales because the

14   Government brings the charges.   I'm going to hear what he has to

15   tell me about what he thinks the sentence should be.   Then, I'm

16   going to turn to Mr. Birdsall.   He's already told me in writing

17   what he thinks it should be, but he's going to have some more

18   arguments for me, I'm sure.   And then after that, I'm going to

19   turn to you.   I've been telling you for two years now that you

20   will get an opportunity to talk to me in the right circumstance.

21   Today's the right circumstance.   Today is the day that you can

22   tell me whatever it is you've been wanting to tell me for all

23   this time about the sentencing, about the case, about the

24   investigation, whatever it is.   You can talk as much as you want

25   to today after Mr. Birdsall gets finished.   Once you finish,

1    I'll make a decision about the sentence, okay?

2            All right.  Mr. Gonzales, Mr. Birdsall, I'm going to

3    start with the argument that Mr. Birdsall made in his Sentencing

4    Memorandum with regard to the applicable mandatory minimum

5    sentence.  And just for the record, I want to go back and -- and

6    recount a little bit of how we got here.

7            After the Government returned the Indictment back in

8    2015, in fact, I guess an extensive time after the Government

9    returned the Indictment, I think probably sometime around the

10   time Mr. Pagan decided to go to trial in January of 2018, the

11   Government filed an 851 notice indicating that it intended to

12   rely on one of Mr. Pagan's prior convictions to seek an enhanced

13   mandatory minimum.

14           The Indictment charges Mr. Pagan with possessing in

15   excess of 500 grams of cocaine.  And under the relevant statute,

16   841(b)(1)(B), that amount triggers a five year mandatory

17   minimum.  However, if the defendant has a prior conviction for a

18   serious felony drug charge or violent felony, then if the

19   Government files the appropriate notice, a mandatory minimum

20   goes up to ten years, and the statutory maximum goes up to life.

21           So on January 5, 2018, the Government filed this

22   notice, which is the required notice, indicating that it planned

23   to rely on a prior conviction to increase the mandatory minimum.

24   The prior conviction that the Government listed in that notice

25   was a 2002 conviction that Mr. Pagan got in Milwaukee County

6

1    Circuit Court.  And that conviction was for a violation of what

2    was then numbered Wisconsin Statute 161.16(2)(b)(1) and

3    161.41(1m)(cm)(1).  The numbers have changed only in the sense

4    that the statutes are now numbered 961 instead of -- I mean 941

5    -- Yeah, sorry, 961 instead of 161.

6            But the relevant count or the relevant charge was the

7    violation of 961.41(1m)(cm)(1).  That statute prohibits -- and I

8    have the text of it in front of me.  That statute prohibits

9    anybody from possessing with intent to manufacture, distribute

10   or deliver certain controlled substances, in particular the (cm)

11   includes cocaine or cocaine base.  And subsections (1m)(cm)(1)

12   is five grams or less.  So that was a conviction for possessing

13   with intent to deliver or distribute or whatever cocaine.

14           Mr. Birdsall argues in his sentencing memo that that

15   conviction does not qualify as a predicate conviction to enhance

16   the mandatory minimum penalty because that statute is broader

17   than or captures more behavior than its federal cohort.  And

18   under the categorical approach that the Supreme Court has laid

19   out in *Taylor v. United States*, if the state statute would

20   capture a larger body of behavior than the federal statute, the

21   state statute cannot be used as a predicate offense.

22           To walk through Mr. Birdsall's argument, he's not

23   arguing necessarily that the state offense of possession with

24   intent to distribute cocaine under 961.41 is broader than

25   possession with intent to distribute cocaine under our Federal

7

1  Statute 21 U.S.C. § 841(a)(1).  What he's arguing is that

2  Section 961.41 of the state code prohibits possession of

3  controlled substances.  And the definition of controlled

4  substances includes Schedule I controlled substances, Schedule

5  II controlled substances or controlled substances analogs.

6          The federal statute doesn't specifically mention

7  controlled substance analogs; although, there is a federal

8  controlled substances analog statute.  What Mr. Birdsall argues

9  is that in state court, a controlled substance analog is any

10  substance that kind of mimics the effects of a controlled

11  substance.

12          In federal court, he says, a controlled substance

13  analog is any substance that mimics the effect of a controlled

14  substance and that is not intended for human consumption.  So he

15  says that those two definitions are different.  And because

16  those two definitions are different, the federal statute is more

17  narrow because it limits analogs to not intended for human

18  consumption.  State statutes's broader because it discusses any

19  controlled substance analog; therefore, this conviction can't be

20  a predicate offense for bumping up mandatory minimum.

21          So Mr. Gonzales, I guess I'll turn to you first.

22          MG. GONZALES:  Well, Judge, the Government takes the

23  position that the distinction is when one looks at the basis for

24  the recidivism statutes in the federal statutes, it's to punish

25  repeat offenders.  It's not to parse -- and I know what *Elder*

1    indicates as far as the -- the type of offenses that we're

2    looking at.  But looking at it in the big picture, the 851

3    statute is to punish for repeat offenders.  So we have

4    Mr. Medina continuing his recidivist habits of continuing to

5    deal in controlled substances.

6            Now, let's take a look at the individual statute.  The

7    federal statutes cover the controlled substances as defined by

8    the schedules.  It also covers counterfeit or fake substances

9    that are included under the statute.  If something mimics a

10   controlled substance that's not technically a controlled

11   substance or doesn't meet the full definition of a controlled

12   substance, it's also covered under the federal statute for --

13   because it is -- you're selling it or distributing it under a

14   counterfeit definition or a counterfeit label, such that I

15   believe that the cocaine he was involved in.  And the Court has

16   the factual basis for the underlying offense that the Government

17   is relying on.  The fact that it was cocaine, the fact that it

18   wasn't an analog, it wasn't any of these -- these -- It didn't

19   deviate from what the statute is designed to address.  So based

20   upon the fact -- the underlying facts of this case, the fact

21   that the federal statutes also cover counterfeit substances

22   under the Controlled Substance Act, I think that it covers the

23   basis for an enhancement under 851.

24           THE COURT:  Okay.  Before I turn to Mr. Birdsall, let

25   me just tell you where I am and give Mr. Birdsall an opportunity

9

1    to address what my concerns are.

2            21 U.S.C. § 802(6) defines the term controlled

3    substances for federal criminal activity.  That section says,

4    "The term controlled substances means a drug or other substance

5    or immediate precursor included in Schedule I, II, III, VI or V

6    part B of this subchapter."

7            And then 841(a)(1) prohibits any person to knowingly

8    or intentionally manufacture, distribute, dispense a controlled

9    substance.  If we look at Section 21 U.S.C. § 813(a), you'll

10   find the definition of a controlled substance analog.  "A

11   controlled substance analog shall, to the extent intended for

12   human consumption, be treated, for the purposes of any federal

13   law as a controlled substance in Schedule I."

14           So first of all, I think contrary to Mr. Birdsall's

15   representation that the federal statute doesn't reference

16   analogs, it does.  It actually defines an analog as a Schedule I

17   Controlled Substance to the extent that it's intended for human

18   consumption.

19           That leads us to Mr. Birdsall's more specific

20   argument.  Mr. Birdsall's specific argument is that the state

21   statute doesn't have that intended for specific consumption

22   piece to it, and that gets me to my question specifically for

23   Mr. Birdsall.  I think the state statute does have that

24   component, unless I'm missing something.  If you look at

25   Section 961.04(4m)(b)4.  961.01(4m)(a) defines controlled

1    substance analog.  The definition is very similar to the federal

2    one.  And then (b) defines what a controlled substance analog

3    isn't.  So a controlled substance isn't an analog.  A substance

4    for which there's an approved new drug application through the

5    FDA is not an analog.  A substance that someone's got an

6    exemption for for investigating is not an analog.  Then, you

7    come to number four, "Any substance to the extent not intended

8    for human consumption before an exemption takes effect with

9    respect to the substance."

10         So it looks to me like the state statute excludes

11   substances that aren't intended for human consumption just like

12   the federal statute does.  So I guess my question for you,

13   Mr. Birdsall, is what am I not seeing?

14         MR. BIRDSALL:  I see your point, and I honestly did

15   not see that.  What was it, 961.04?

16         THE COURT:  It's 961.01 (4m) as in Michael, (b)4.

17         MR. BIRDSALL:  I guess I was -- When I was analyzing

18   this, it wasn't -- When I think about the categorical approach

19   and the elemental breakdown that the court envisioned in *Elder*

20   and I suppose in *Taylor* too didn't include cross referencing

21   from other statutes.  It was more of a literal, you know, it's

22   sort of like a *Blockburger* thing where it's an element, element,

23   element, and it would take the plain language of the statute.

24         And so that was really where I was coming from, and so

25   I -- I don't know -- I understand it's sort of like the state

1   does it the reverse way that the federal statute says it.  It

2   includes the human consumption aspect of it.  But I guess -- I

3   guess my view of -- of the way that we need to apply the *Elder*

4   test was to take the actual statutory language and statutory

5   structure of -- of the charged statute for the prior conviction

6   and the current one, and that was it.  And all of the associated

7   cross referencing wouldn't come into play there.  Because it

8   seems to me that when appellate courts try and fashion tests

9   like this, they're looking to do it, in a sense, in a way that's

10  going to be as clear as possible for both the litigants and

11  trial courts to apply it.

12          It seems to me that if *Elder* is going to be a useful

13  -- usefully applied by all of us in the trial courts, that --

14  that it has to mean that it's just the plain language there of

15  the -- of the old statute and the new statute, whatever is in

16  play there.  So I guess that's my position.

17          THE COURT:  So I, obviously, don't want to necessarily

18  engage in argument with you, Mr. Birdsall.  But first of all,

19  *Elder* doesn't say that.  I don't think *Taylor* does either.

20          But more to the point, the state law prohibits

21  somebody from possessing or manufacturing or distributing

22  controlled substances or controlled substance analog.

23          The federal law prohibits somebody from possessing or

24  manufacturing or distributing controlled substances.  And the

25  definition of controlled substances includes controlled

1    substance analog.

2          The definition of a controlled substance analog under

3    state court requires human consumption under the section that I

4    just gave you.  And the definition under the federal law

5    requires human consumption.  So you sort of said you don't need

6    to look at all the other cross references.  I don't know how you

7    figure out whether anybody violated either one of those statutes

8    unless you look at those cross references.

9          And my understanding of the categorical approach has

10   been, as I kind of put it broadly at the beginning, if the

11   predicate offense covers more conduct than the offense it would

12   trigger, it can't be a predicate offense.  My understanding is

13   that you are arguing that the state law covered more conduct

14   because it covered anything that humans would ingest and

15   anything that humans wouldn't, but it doesn't.  So I don't see

16   how the state law would -- I'm trying to imagine a circumstance

17   where the state law would capture behavior that the federal law

18   doesn't.

19         And I actually tried before coming out.  I thought

20   about it for a while to try to imagine what would be a

21   circumstance that somebody could be convicted under the

22   definition of analog in state court and that wouldn't result in

23   a conviction in federal court, and I couldn't think of one.

24   That doesn't mean there isn't one.  I couldn't think of one.  So

25   unless you can think of one --

1      MR. BIRDSALL:  I haven't engaged in that exercise, but

2  what I've heard you say and I too am not trying to be

3  argumentative, was that one can get convicted under the state

4  law and in that conviction mutually they're going to use the

5  cross references and whatnot in the application of the law in

6  that prosecution.  But I sincerely think that just like we're

7  having this conversation at all right now is that the appellate

8  courts look to avoid that sort of mind field if you will of

9  additional almost potentially endless analysis from the federal

10  and the state side in applying this proposition of what

11  constitutes a predicate offense.

12      And so that's why I just came at it from the, you

13  know, strictly the literal sort of this is what the statute says

14  and compared them because it seemed to me that's what they were

15  directing us to do.

16      THE COURT:  Okay.  And so that we don't go back and

17  forth and argue anymore, I'm going to make my decision, but I

18  will assert I don't think that's exactly what you did.  Because

19  you looked at the state statute of conviction and then you went

20  further and you looked at the definitional section to find out

21  how the state defined analog.  That's all I did with the federal

22  statute.  I came to the same conclusion.  So I appreciate the

23  argument, but I believe that the 2002 Wisconsin conviction is a

24  valid predicate for triggering the enhanced sentence under

25  841(b)(1)(B).

14

1        And, of course, you're free to challenge that on

2  appeal.  And the Seventh Circuit may tell me that you're right

3  and I'm wrong.  But until then, I believe that the appropriate

4  mandatory minimum sentence is the ten year mandatory minimum,

5  the 120 month mandatory minimum because of the valid 851 notice

6  and prior conviction.

7        The second issue that -- that Mr. Birdsall raised has

8  to do with whether or not, and this is a guidelines issue,

9  whether or not Mr. Pagan qualifies as a career offender.  This

10  is also a predicate conviction issue, but I just -- I want to

11  walk through briefly.

12        The Presentence Investigation Report suggested that

13  the base offense level for Mr. Pagan's offense should be 28.

14  And the way that the presentence writer came to that conclusion

15  was by taking the amount that was actually intercepted by the

16  postal service, which was a little over 1.6 kilos, and then

17  taking a conservative estimate of what Mr. Duenas testified.  He

18  said he got five to seven additional packages each with anywhere

19  between a half key to a key.  And the presentence writer made a

20  conservative estimate, five packages, half kilo each,

21  two-and-a-half additional kilos and came to the conclusion that

22  the amount attributable to Mr. Pagan was between

23  three-and-a-half and five kilograms, and that resulted in an

24  offense level of 28.  However, the presentence writer indicated

25  that because Mr. Pagan qualifies as a career offender, the

1   offense level jumped up to 37 given again this assumption that

2   his minimum was ten, maximum was life.

3       So the reason I'm taking the career offender question

4   next is because if Mr. Pagan is a career offender, then the

5   issue of how we calculate the amount of drugs relevant to

6   Mr. Pagan kind of becomes a non-issue because that's not the

7   basis for the offense level.

8       With regard to that argument, the presentence writer

9   indicated that Mr. Pagan had two prior felony drug convictions.

10  The first one is the one we just talked about, the 2002

11  Wisconsin conviction, and I've just given you my ruling on that,

12  whether or not that constitutes a qualifying predicate offense.

13      The second possibility was a 2009 drug conviction from

14  Puerto Rico.  The presentence writer did not consider that to be

15  a predicate offense because the conviction was under Section 406

16  of the Controlled Substances Act in Puerto Rico.

17      That's the conspiracy, attempted conspiracy portion of

18  the statute, and the underlying substantive offense was a

19  violation of Section 404, which is the portion of the statute

20  that prohibits possession but not with intent to distribute.  So

21  that didn't qualify as the quote, unquote serious felony offense

22  that's required under the guideline.

23      The second conviction, according to the presentence

24  writer, is the 2011 conviction in Puerto Rico.  It appears and I

25  don't have the underlying paperwork, but it appears that

1  Mr. Pagan was charged in a consolidated case, one case charged,

2  with violating Article 401, which is or can be at least

3  possession with intent to distribute or to deliver.  And the

4  second one charged him with Article 406, which is conspiracy.

5          The eventual plea was to 406, and that's what the

6  sentencing was on, 406.  And Mr. Pagan got, I think, a suspended

7  sentence or an imposed and stayed sentence of four years.

8          Mr. Birdsall argues then that the Commonwealth statute

9  was broader and captures more behavior than the federal statute

10 because under Article 401, it is illegal to manufacture,

11 distribute, sell, transport or conceal controlled substances.

12 The federal statute does not discuss concealment.

13         And so Mr. Birdsall argues again that because you can

14 violate the Commonwealth statute by concealing drugs and that

15 wouldn't be a violation of the federal statute, the 2011

16 conviction under 406 doesn't count -- I'm sorry -- or doesn't

17 qualify as a predicate offense for being a career offender under

18 4B1.1.  So Mr. Gonzales.

19         MG. GONZALES:  Yes, Judge.  I think that

20 Mr. Birdsall's claim, if I'm understanding it correct, is that

21 by including the language transport and conceal in the statute,

22 it's broader than the federal statute, which doesn't have that

23 language but does have the language of import or export.  And as

24 the Government in its response to the probation department

25 indicated that the transport and to export covers the someone

1    who -- someone knowingly possesses an item, they would -- they

2    would and out of inevitably if they were -- if they put the --

3    the item into motion, I would say, whether it's transporting it,

4    and more than likely if they were transporting it, they were

5    also concealing it because they wouldn't leave it out in the

6    open.  But that the federal statute which covers the

7    import/export, the Government would argue, is similar enough

8    conduct with the other possession and other descriptors under

9    the federal statute to encompass the -- I can't imagine a

10   scenario in which somebody would transport drugs that weren't

11   covered under the federal statute.  People do that all the time.

12   They put cars, drugs, concealed them in traps and transport them

13   from point A to point B.  That's covered such that I think that

14   there's nothing unique about the federal -- about the Puerto

15   Rican statute that couldn't be covered by the federal statute,

16   so I guess that's the Government's position.

17            THE COURT:  Mr. Gonzales, if I could, could I ask you

18   to address, and my view I don't think transport's the issue.  I

19   agree with you.  I think import/export -- import and export is

20   just kind of a narrowing of transport that's, you know, moving

21   from point A to point B.  I agree with you.  What I'm wondering

22   if you wouldn't address though because it has come up is

23   conceal.  I mean, I actually can't imagine that someone conceals

24   drugs without transporting them.  I mean, you know, there --

25            MG. GONZALES:  I guess my response to that would be

1  that you can't conceal something without possessing it for

2  purposes of the concealment.  So if you have the ability to

3  exercise control over an item and you cover it up or do

4  something to prohibit others from finding it, I'm guessing

5  you're exercising some control over that item.

6  　　　　　As far as conceal goes, I think that it is -- Again

7  the whole -- When people are involved in drug trafficking, the

8  purpose behind their efforts is to avoid detection.

9  　　　　　THE COURT:  Right.  But I'm sorry to interrupt you,

10  Mr. Gonzales, but we all know that this categorical approach

11  then is a whole different ball game.  It doesn't look at sort of

12  the broad general purposes of the statute and say, well, as long

13  as this one kind of intended the same thing as this one does.  I

14  mean, I'll be frank with you, the First Circuit -- Seventh

15  Circuit, obviously, has not dealt with this statute because --

16  Puerto Rican statutes I don't think comes up much here.  But the

17  First Circuit has, and there is a decision from 2011, *Carlos*

18  *Davila-Felix*.  *United States v. Carlos Davila-Felix*, and it is

19  at 667 F.3d 47.  And the First Circuit actually found that

20  because conceal appears in Article 401, Article 401 is broader

21  than 841(a)(1) and can't act as a predicate offense because of

22  the word conceal because it may have found that conceal was

23  broader.

24  　　　　　Now, there's another case that's very recent, on

25  January 24th of 2019.  *Jose Martinez-Benetiz*, *United States v.*

1  *Jose Martinez-Benetiz*, 914 F.3d 1, just this year in January, in

2  which the Government asked the First Circuit to kind of rethink

3  that decision.  And because there were some other issues in the

4  case that kind of decided, the First Circuit said, we don't need

5  to get to that, and so it didn't address the question of

6  reconsideration.  So as we sit here right now, the First Circuit

7  has found that 401 is -- cannot be a predicate offense for the

8  career offender.

9  　　　　　MG. GONZALES:  Well, Judge, to be completely honest, I

10  know that I've gotten a recent memorandum from the appellate

11  section regarding *Elder*, and -- that advising us that in cases

12  like this in regards to precedent and other circuits, that more

13  than likely we're going to lose.  So what the Court is telling

14  me is not something that I'm -- I'm -- I ultimately think that

15  probably -- not probably.  I trust the Court's analysis on these

16  issues.  And looking at this, I believe that I think that the

17  Court's analysis is probably correct in applying the circuit

18  application such that this law is continually changing, and

19  we're getting directives.  But I think that it will impact the

20  -- I think that this is a much closer issue.  And that based

21  upon that, I don't have any objection in the event that the

22  Court makes the finding that he is not a career offender and

23  then resets the statute or resets the guidelines as they would

24  apply without that finding.

25  　　　　　THE COURT:  Thank you, Mr. Gonzales.  Let me just say

1 │ two things.  First of all, Mr. Gonzales has referred a couple of

2 │ times to *Elder*, and Mr. Birdsall has referred to *Elder*.  And

3 │ just for the purposes of the record, the case they are both

4 │ referring to is *United States v. Elder*, 900 F.3d 491, a decision

5 │ from August of last year by the Seventh Circuit that talked

6 │ about what constitutes a predicate felony offense for the

7 │ purpose of increasing the statutory mandatory minimum, which is

8 │ what we talked about with regard to the first issue.  So I just

9 │ wanted to put that on the record.

10 │        The second thing that I'll say for the record, and

11 │ this also goes for Mr. Birdsall, obviously, with regard to my

12 │ earlier decision, because of the First Circuit decision in

13 │ *Davila-Felix*, I think that -- I don't believe that the Puerto

14 │ Rican statute can qualify -- The 2011 conviction in Puerto Rico

15 │ qualifies Mr. Pagan as a career offender under 4B1.1, and that

16 │ will be my finding.  But what I was going to say is, obviously,

17 │ both of you given that I think I've kind of sprung things on

18 │ each of you, if after today you both go back to your offices and

19 │ you look at things and discover that I've said something you

20 │ think I've gotten incorrect or whatever, you have the ability,

21 │ of course, to ask me to reconsider, and I'll certainly consider

22 │ those requests.

23 │        So I am going to find that Mr. Pagan does not qualify

24 │ as a career offender, and that then takes us to the third issue

25 │ that Mr. Birdsall raised.  It may be a non-issue and given the

1    mandatory minimum.  But the third issue that he raised was the

2    question of the amount of drugs that I should use, and this

3    was -- doesn't involve parsing any statutes.  Mr. Birdsall

4    simply argues that Mr. Duenas is not to be believed, and that I

5    expressed an opinion on March 6th when I issued the verdict at

6    the trial that Mr. Duenas had been less than truthful in some

7    ways.  And Mr. Birdsall says that based on that, I should not

8    consider any amounts of drugs other than the 1.6 kilos, give or

9    take, that were in the package that was intercepted by the

10   postal service.  And so I wanted to give you an opportunity to

11   respond to that, Mr. Gonzales.

12        MG. GONZALES:  Well, Judge, based upon the Court's

13   first ruling, I think that that puts his advisory guidelines at

14   120 months under the mandatory minimum.  Looking at the

15   arguments -- the Government's version, if the Court accepts it,

16   would place the defendant at a guideline of 97 to 121 months,

17   which is one month more at the high end than the mandatory

18   minimum.

19        If the Court accepts Mr. Birdsall's argument, that

20   puts him at 77 to 96 with a lower drug weight amount.  But

21   because the mandatory minimum is the mandatory minimum, I'll

22   address the argument, but I think that ultimately it is -- The

23   outcome is controlled by the mandatory minimum application.

24        But looking at the argument, the Government's position

25   has been that Mr. Duenas was, though he had his moments, overall

1    was a reliable source in that he provided information to law

2    enforcement that lead to the identification of Mr. Medina.  It

3    also confirmed what law enforcement had already known.

4            As the Court was aware, this case began when our --

5    began by the postal service who began looking at packages that

6    were being shipped based on information that they were receiving

7    from Puerto Rico that these drugs were coming into the United

8    States, and they were coming from potentially Mr. Medina.  So

9    postal inspectors conduct their investigation.  And as they

10   testified at trial, they -- they began monitoring an initial

11   package that came from Puerto Rico, similar size, similar weight

12   as the one that was ultimately delivered.  They followed that

13   package to almost to completion of delivery of that package to

14   see who was going to show up, who was going to be involved in

15   taking receipt of that, which helped them identify Mr. Duenas as

16   somebody who was on the receiving end of that package.

17           On the front end of the investigation, there was the

18   attempted arrest of Mr. Medina Pagan in Puerto Rico.  And when

19   law enforcement attempted to stop his vehicle, he got into

20   somewhat of a precarious chase on dangerous roads in Puerto Rico

21   ultimately abandoning his vehicle and running into the woods.

22   There were shots fired between the officers and Mr. Medina or

23   Mr. Pagan, which lead to a follow up of, as the Court was aware,

24   a search warrant that was done on Mr. Pagan's vehicle in which

25   law enforcement recovered, among other things, four receipts

1  that were taken from his vehicle that were sent over August 8th,

2  August 6th, August 20th and July 17th from Puerto Rico to

3  Wisconsin, in fact, Milwaukee, Wisconsin.

4          In one of those receipts, it actually had the name of

5  Rodolfo Duenas attached to it.  So we have Mr. Duenas, who gives

6  and testified that there were multiple packages.  We have -- but

7  we don't have to rely solely on his memory because we have the

8  postal inspector who did a control delivery of one package to

9  see if they can identify Mr. Duenas for hope of ultimately in

10  which they ultimately did get a search warrant for his residence

11  or identified the residence where the packages were going so

12  that on the day of the next package that came through, they

13  could execute a simultaneous search warrant with the delivery of

14  the package on the residence of Mr. Duenas, which they, in fact,

15  did.  And then we have the information that there were four

16  postal receipts in the defendant's vehicle that was registered

17  to his wife, that the officers identified as him being involved

18  in the gun battle, and that these four packages preceded the

19  ultimate deliveries in this case by a few months and were

20  packages from Puerto Rico to Milwaukee consistent with what

21  Mr. Duenas said.

22          So based upon what Mr. Duenas said and what the postal

23  inspectors and the evidence at trial, I think that there is

24  evidence that this wasn't just a one-time occurrence, that there

25  were multiple occurrences.  And that using the estimations of

1    the probation agent by making a conservative estimate of just a

2    half a kilogram each delivery, that it places Mr. Medina in that

3    three-and-a-half to five kilogram range.  Even using even

4    smaller amounts, you still get to that basis because we have 1.6

5    to start off.  We're trying to get -- We're trying to create two

6    more.  And, in fact, we have, you know, five other deliveries of

7    packages that were sent.

8             So based upon the facts and the evidence in support of

9    what Mr. Pagan or what Mr. Duenas said, I think that there is a

10   basis to find that he was responsible for three-and-a-half to

11   five kilograms of cocaine in this case.

12           THE COURT:  Thank you, Mr. Gonzales.  Mr. Birdsall.

13           MR. BIRDSALL:  Thank you, Judge.  To say that

14   Mr. Duenas was a reliable source really stretches the definition

15   of using any words at all.  I made the argument at a closing

16   before you rendered your verdict about this whole issue about

17   the search in Puerto Rico and the receipts in the car.  And I

18   see now that the same attempts to use that and Mr. Duenas'

19   comments to make a finding that there's these multiple

20   deliveries.  Well, I think that's wrong for two reasons.  One,

21   as Mr. Duenas as we all were here when he was on the stand,

22   there might have been morsels of truth every once and a while,

23   every few minutes.  But most of it was him just sort of making

24   stuff up as he went along, and that's number one.  Number two is

25   we remember and this is the argument I was referring to that I

1    made at the closing.

2            When we look at the four receipts that are found at

3    this car, I specifically remembered and I forgot the gentleman's

4    name that was a witness about how he had secured the car and

5    everything was, you know, nobody touched it.  And they went in

6    and executed the warrant the next day.  If I recall, this was --

7    August 19th was the date.  And in one of the receipts, and this

8    was Exhibit 20 of the trial -- from the trial exhibits, was that

9    exact date, except it is executed and created in Milwaukee that

10   day.

11           So, you know, to say that, you know, somebody's lying

12   here.  And so I don't think even though and I realize I'm

13   climbing a steep hill since you've already made the finding at

14   the guilt/innocence level, but and you don't even have to make

15   that high of a finding with regards to -- with regards to drug

16   amounts.  But when you made that finding at the verdict level,

17   you were -- you weren't looking just -- you were just looking at

18   guilt/innocence for the charge itself.  What we're concerned

19   with now is more the relevant conduct, breath of the offense

20   sort of thing for purposes of finding the drug weights and

21   coming up with an accurate calculation.

22           And so whatever analysis you went through with regard

23   to connecting the receipts and I remember some of the rational

24   was, you know, there was multiple receipts and then of course we

25   have the fingerprints and all of that, but none of that

1  addresses these -- these other, I don't know what the term is to

2  use, but I guess ghost drugs that -- that Mr. Duenas testified

3  about.  And we're now -- You're now being asked to use all of

4  these other dates with, you know, kind of unknown amounts

5  because none of it ever got seized or tested or anything.  It's

6  all because Mr. Duenas says so.

7       And so it's one thing to find some sort of

8  corroboration for purposes of guilt or innocence with regard to

9  this offense, but it's quite another, I think, to find it with

10  regards to these other unknown dates and amounts and whatever

11  that Mr. Duenas has generated here.  And frankly, you know, this

12  has been a long-standing complaint that I and many others have

13  had with regards to how things are done in the federal courts in

14  terms of finding drug weights.  So but I think we're -- I think

15  I'm in a good place to ask you not to do that given who

16  Mr. Duenas is and who we all saw testify.  So those are my only

17  comments, Judge.

18       THE COURT:  Thank you, Mr. Birdsall.  It is true as

19  Mr. Birdsall indicated that on the day that I issued my verdict,

20  I agreed with Mr. Birdsall and actually went back and pulled up

21  the recording of -- My staff pulled up the recording of that

22  hearing.  And Mr. Birdsall pointed out several places where

23  Mr. Duenas was arguably less than truthful or certainly

24  inconsistent.  And he's right that I said that Mr. Birdsall had

25  and I quote, something of tenuous relationship with the truth,

1    unquote.  One of the bases that I used for saying that was that

2    he went into some detail, Mr. Duenas did, to testify that he had

3    a policy that you don't ever lie to the police.  Because if you

4    lie to the police, they figure it out and they catch and you get

5    in lots of trouble and it's real bad thing and he would never do

6    that.  And then at some point, I can't remember if it was before

7    or after that, someone asked him a question, and he said, well,

8    no I didn't tell the truth, I always lie to the police.  So we

9    had that moment, which was funny in a sad way.  Perhaps a bigger

10   issue that I had, and I mention this, also was Mr. Duenas'

11   testimony was very confusing.  Mr. Duenas, clearly, knew a whole

12   lot of players who were involved in whatever drug trade he was

13   involved in in Milwaukee, and I think I actually said and I went

14   back and checked the hearing.  Mr. Duenas was trying to explain

15   who was who and there were no fewer than three different people

16   who he said were named Ricky, but I couldn't figure out which

17   Ricky was who and who sold what to whom, so it was confusing.

18           But by the same token, I also said when I gave that

19   ruling the fact that he is not believable in all respects does

20   not mean that he is entirely incredible, and some portions of

21   testimony -- his testimony were corroborated by other evidence

22   in this case, and that brings us to Mr. Birdsall's argument.

23           So I -- The Government doesn't have to prove the drug

24   weight beyond a reasonable doubt, and I know Mr. Birdsall's not

25   -- doesn't think that's a great thing and maybe a lot of people

1    don't think that's a great thing, but that is the status of the

2    law as we sit here right now.

3              The Government has to prove by a preponderance of the

4    evidence the amount of drugs.  What do we know for sure?  We

5    know for sure there was 1.6 kilos that was intercepted.  That

6    tells us some other things.  At least it tells me, I think, that

7    it's unlikely that that was the first shipment that made it from

8    Puerto Rico to here because it's not an insignificant amount to

9    start off with.  We know that there were some receipts in that

10   car.

11             Now, Mr. Birdsall, you've argued that one of them may

12   very well have been manufactured by somebody, may have been

13   misdated, I don't know.  But that still leaves three other

14   receipts.  It is notable to me that Mr. Duenas did not Orlando

15   sent me, you know, 25 different shipments or 500 shipments.  He

16   said five to seven.  The probation department took a

17   conservative cut at that, and Ms. Mahmoudi used five.  And he

18   said five to seven and anywhere from 500 grams up to a

19   kilo-and-a-half.  And the probation department elected

20   conservatively to use a half a kilo.  Even if we discard two of

21   those, and we say only the three that there were receipts --

22   predated receipts in that car in Puerto Rico, even that at a

23   conservative estimate would give us a kilo-and-a-half plus the

24   1.6 that we know was intercepted.

25             Mr. Duenas, if you'll recall, also went into some

1    detail about the instructions that he had gotten about how to

2    handle the money, turning around going back.  And some of the

3    testimony that I found credible was the fact that he was very

4    specific in how he was to handle the money, and that that

5    happened more than once.  So, perhaps, three-and-a-half to five

6    kilos may be high.  But even if we -- If we drop down to the

7    next level and we look at the two to three-and-a-half kilos,

8    which seems to me imminently reasonable given that we already

9    have 1.6, and I simply find it hard to credit that this is the

10   only time that this occurred given the amount that was shipped

11   and the evidence that we saw.  That puts us, as Mr. Gonzales

12   indicated, at 78 to 97 months, and that is below the mandatory

13   minimum of 120 months, which I have no choice but to go under.

14        So I do think that Mr. Duenas was credible on -- on

15   some things.  I think it is credible to believe that there was

16   more weight than simply this 1.6 that was intercepted.  I will,

17   I guess, adopt Mr. Birdsall's argument to the extent that I'll

18   find that the applicable amount is two to three-and-a-half

19   kilos, which puts us at level 26.  Mr. Duenas'(sic) criminal

20   History Category is three because he's not a career offender and

21   level 26.  And Category 3 puts us at a sentencing guideline

22   range of 78 to 97 months.  But as Mr. Gonzales indicated, that's

23   below the mandatory minimum, so that will be my finding as to

24   drug amounts.

25        And so I think basically where we are is that we have

1    a sentencing guideline range with a high end of 97 months, a

2    mandatory minimum of 120 months.  And the real question that

3    that then leaves for us in terms of at least for me in terms of

4    sentencing is whether I should go above the 120 months.  I know

5    Mr. Birdsall's going to say, no, I should not, but I will give

6    him an opportunity to tell me why.  But first, I'm going to

7    start with Mr. Gonzales and ask for his view and what the

8    appropriate sentence should be and why.  Mr. Gonzales.

9            MG. GONZALES:  Judge, the Government does believe that

10   the Court should go above the 120 months, and we do so based

11   upon a number of factors.

12           First and foremost, I know that the Court has to look

13   at and apply the law as applies to these prior convictions.  But

14   as I indicated earlier, when Congress passed the recidivism

15   statutes and when they tried to address this problem, they are

16   looking at those people who continue to violate the controlled

17   substance laws of the state and federal governments.

18           And when one looks at Mr. Medina Pagan's record, it's

19   clear that he continues to be involved in controlled substance

20   violations.  When one looks at his prior criminal history, it is

21   basically a controlled substance violation after controlled

22   substance violation.  There's, you know, whether they qualify or

23   whether they fall under the requirements for the increase in --

24   in the criminal history or the mandatory minimum, the fact

25   remains that Mr. Medina has continued to involve himself in

1    violations of the Controlled Substance Act.  So I would say the

2    bulk of all of his criminal contacts and convictions have to do

3    with violations of the Controlled Substance Act.

4          So we've got a multiple repeat offender.  Within this

5    one investigation and this trial, there were multiple

6    involvements by Mr. Medina in distributing or selling controlled

7    substances.  We also have what I deem as extremely troubling the

8    testimony of the officer in Puerto Rico who said he tried to

9    pull over Mr. Medina's car or a car that was registered to his

10   wife; that Mr. Medina basically tried to shoot him, fired

11   multiple rounds out of his vehicle as they came into contact;

12   that he called for back up; that Mr. Medina was seen grabbing a

13   bag and running from the vehicle; and that the officer didn't

14   pursue Mr. Medina into the jungle or into the woods because he

15   feared for his own safety based on the interaction with

16   Mr. Medina when he tried to do the traffic stop.  There was

17   basically a gun battle.

18         And so based upon, you know, this long criminal

19   history, a criminal history that is littered with controlled

20   substance violations and based upon the criminal conduct of, you

21   know, limited contact that we had with him in this investigation

22   as far as, you know, he's sending these packages so we're not

23   dealing with him on a day-to-day basis.  But when we ultimately

24   try to place him under arrest and take him into custody, this is

25   what we get.  We get somebody firing a firearm at law

1    enforcement officers.

2            So based upon those factors, the Government believes

3    that the Court should go beyond the mandatory minimum in this

4    case of 120 months.  We're above and beyond the guidelines now

5    so that as to what amount the Court should go over, I'm not

6    sure.  But I think that this is not -- In a typical repeat

7    offender, 120 months would be appropriate.  But in Mr. Medina's

8    case, we have these multiple violations, but we also have this

9    conduct where they try to take him into custody, that he gets

10   involved in this shoot out.  So based upon that, the Government

11   believes that the Court should sentence Mr. Medina to a term of

12   imprisonment greater than 120 months.

13           THE COURT:  Thank you, Mr. Gonzales.  Mr. Birdsall.

14           MR. BIRDSALL:  Okay.  This comes in several layers, I

15   guess.  First of all, the mandatory minimums that have been

16   established, obviously, this Court is bound by them, but they

17   are ridiculous.  And so if the decision is do I go above them,

18   they're already a ridiculously high number that's been

19   arbitrarily established by Congress.  The whole idea of the

20   mandatory minimums were to be super tough, super severe.  Well,

21   they are.  Those are one of the reasons why we have the highest

22   rate of incarceration in the world in this country.

23           So -- So that's just sort of an offset.  You'd have to

24   -- You'd have to come up with, you know, some really, like, I

25   don't even know what kind of facts to justify going above

1  something that's already been established as a very, very severe

2  sentence, and that's number one.

3          Number two is that if we look at the mandatory

4  minimums that are set and what his guidelines now are after the

5  Court's rulings, I don't know that there is a credible argument.

6  If this Court has to start with the guidelines as a base level,

7  right?  That's -- That's the standard operating procedure.

8          THE COURT:  No, no.  I have to consider them.  I don't

9  have to start with them as a base and go up.  I'm surprised to

10  hear you argue that, Mr. Birdsall.

11          MR. BIRDSALL:  True.  I wasn't -- That wasn't my

12  point.  That is -- It is something that has to be considered.

13  Well, if we consider it, it's substantially lower than the 120

14  months, substantially.  I mean when I did the math off the top

15  of my head, you know, I guess 40 months lower.  So -- So just as

16  a matter of just, you know, legal standards, mandatory minimum

17  and the -- the applicable guideline range is being considerably

18  lower, it seems kind of an easy conclusion just to go right to

19  the mandatory minimums.

20          This -- The whole threat of having the mandatory

21  minimums doubled, as has happened here, was always present for

22  Mr. Medina's and my discussions pretrial.  And one of the -- One

23  of the things that he expressed to me, but certainly also to the

24  Court in many filings, much to my chagrin, was that he felt that

25  he was being targeted by some of these police down in Puerto

34

1    Rico.  Well, I didn't know what to make out of that at first,

2    I'll be honest, but I have an obligation to explore anything

3    that could arguably be helping my client or, you know, in any

4    form or fashion so I explored it, as this Court knows.

5              And it was very difficult because of the language

6    barrier and the distance.  But what we discovered was that he

7    was right about a lot of that.  And so I'm not trying to say

8    it's okay to not stop for the police and shoot at them.  What

9    I'm saying is that, you know, that I understand that courts may

10   view people who go to trial or don't accept responsibility as

11   maybe deserving more -- some sort of additional punishment for

12   that or maybe it's the reverse.  You get the benefit of the

13   acceptance, but he had -- He had legitimate gripes that he

14   uncovered.  And I advanced some of them to the Court, and maybe

15   I didn't -- wasn't able to connect all the dots just because of

16   the limited resources that we had to do it, but it was -- It was

17   clear to me.  We had one officer who actually testified here who

18   was associated with this group of officers that got convicted of

19   stealing some evidence, and I don't remember all the details,

20   but it is all part of the record.

21             In addition, there was a situation where Mr. Medina

22   was -- had drugs planted on him, and it turned -- It was

23   revealed through the course of a trial.  He was acquitted.  The

24   officers were -- There was a lot of bad blood let's put it that

25   way between Mr. Medina and the police down in his home town.  In

1  fact, he's had three separate acquittals because of corrupt

2  police practices.  So when he uses those terms, you know, if I

3  hadn't done the investigation, I would have just thought that

4  maybe he was, you know, doing some excess complaining.  But

5  that's one of the reasons that, you know, he felt like he was,

6  you know, there was some -- I'm not going to use the term

7  conspiracy because I can't show that but, you know, that -- that

8  because of all that bad history that he has with the police down

9  there, that there was something more afoot here than just

10 Mr. Duenas.

11      So I guess that takes me to the discussion that we

12 would have about me and my client before trial because, you

13 know, it doesn't mean that there's a possibility that the five

14 years that he was facing could be ten, and he chose to go

15 forward.  So -- So the original offense, five years, if he had

16 accepted some sort of a negotiated settlement, the guidelines

17 approximately 77 plus months, and the now applicable mandatory

18 minimums after -- after his unsuccessful trial.  I think it's

19 kind of -- I think that a penalty like that encompasses a lot of

20 conduct, and it's more than sufficient to address anything --

21 any kind of concerns the Court could possibly have.

22      Obviously, if it wasn't applied, I would be asking for

23 something along the low end of the guidelines or lower.  So I

24 know a lot of times in sentencings people, defendants, you know,

25 sometimes their histories are bad and some judges are, you know,

1  kind of looking at that more heavily than maybe their personal

2  side.  But I've always been of the belief, you know, there's --

3  people do -- if you get convicted of crimes, they commit crimes,

4  but that doesn't mean that somehow they're inherently a

5  throwaway person, and that we need to see them be gone for these

6  incredible amounts of time.

7         And that's the case with Mr. Medina.  He's got his two

8  absolutely two lovely children.  Karina and Ashley are here

9  today as is his ex, their mother, Lisa Rivera.  He's done good

10  in this world with them.  I just met them today, but and -- and

11  so, you know, I describe his family life in our Sentencing Memo.

12  I guess what I'm saying, Judge, is that, all right, there's

13  certain, you know, prescribed things in the law that we have to

14  deal with, but it's already going to have a huge impact not only

15  on his life, obviously for him doing the time, but on the lives

16  of his children and his loved ones.  So I'm asking respectfully

17  in all the arguments that we've already hashed out and reserved

18  to do -- to impose simply the mandatory minimums.

19         THE COURT:  Thank you, Mr. Birdsall.  I do have one

20  question about a comment or a statement that you made.  You

21  indicated that Mr. Pagan has three acquittals.  The Presentence

22  Report does not reflect that.  It reflects the one in 2009.

23         MR. BIRDSALL:  These were in Puerto Rico.

24         THE COURT:  I know that.

25         MR. BIRDSALL:  And so I was going off of -- I'm basing

1   this off of the research we did.

2           THE COURT:  The Presentence Report reflects a number

3   of cases that were brought against Mr. Pagan in Puerto Rico.

4   There were some that were dismissed for various reasons, I don't

5   know what, but only one reflects an acquittal, and that is one

6   for some weapons charges in 2009.

7           MR. BIRDSALL:  So when I made that reference, it was

8   just based on discussions I had earlier with my assistant here.

9   And I see two cases, acquittals.  You're right, there was two

10  others that were dismissed.  The case numbers I have for

11  acquittals are 2009s, CLA2009G148, 149.  That appears to be one

12  case, those two numbers, 148, 149.  And then the same numbers,

13  except 146 and 147, also appears to be a separate case, also.

14  Perhaps I misspoke when I said three.  It looks like from our

15  orders, at least, because we wouldn't have gotten all the --

16  obtained all the original documents, so that's the information

17  that I had.

18          THE COURT:  The probation department has one of these.

19  It has the 146.  But it reflects that 148 and 149 is a

20  dismissal, not an acquittal, which as you know could be for a

21  variety of reasons and not necessarily a not guilty finding.

22  All right.  Thank you, Mr. Birdsall.  Okay.  Mr. Pagan, it is

23  your turn.  And all I would ask is that Mr. Birdsall move the

24  microphone over whether it's going to be Ms. Wirth or Mr. Pagan,

25  whoever is going to be speaking, that they have access to the

1   mic.

2   INTERPRETER:  I am a little bit nervous.  I'm a little

3   bit scarry.  I'm scared that what I'm about to say may affect my

4   sentence.  I don't know a lot of English, but I wrote this down.

5   I practiced it, and I would like to try to talk to you in

6   English.

7   THE COURT:  Okay.  Thank you, Ms. Wirth.

8   DEFENDANT:  Good afternoon.  Good afternoon, Your

9   Honor.  And good afternoon to everybody in this courtroom.  God

10  bless everyone and everyone's family.

11  First of all, I want to thank -- I want to thank you

12  for giving me this opportunity to express myself to you, and I

13  want to thank Mr. James Birdsall, my lawyer, for the great job

14  that he did through my whole case and also at trial.  I love to

15  have him and continue to be my lawyer in my appeal motion.  I

16  want to thank Alexandra, the interpreter, for the magnificent

17  and great job that she did in the translation of the key witness

18  statement.  She did it in Spanish and English and, Your Honor,

19  that was a lot of work what she did, and she did a great, great

20  job.  She got to be one of the best in the country with all the

21  respect that all the translation that translated because all of

22  them are really good and professional.

23  Your Honor, I don't want nobody in this court and this

24  courtroom to feel offended by the words that I'm going to say.

25  I'm just trying to defend myself if applied to me in this case.

1    And please excuse my English because I don't know how to express

2    it well.  I don't want to sound disrespectful.  That's the last

3    thing I want this Court to think about me.  I've been practicing

4    what I'm about to say in this court for months and months,

5    waiting for the perfect moment, so I can express myself to you,

6    Your Honor.  Thank you for giving me this opportunity, and I

7    hope that the U.S. Attorney don't take advantage of my little

8    English because it's not that good, and I don't got the right

9    understanding.  I want to ask my lawyer to correct me if I say

10   something backwards or misunderstanding.

11            Your Honor -- Your Honor, the persecution and

12   harassment against me from the Puerto Rico police start in 2006

13   when some detective fabricated a case.  They planted drugs and

14   guns inside my mother's house and arrested me, which my lawyer

15   proved beyond a single doubt to the honorable judge in Arecibo,

16   Puerto Rico that those officer lie and perjury.  The honorable

17   judge with a lot of knowledge about the law dismissed the case

18   and all those accusations that those officer make against me.

19            After the honorable judge find me innocent, my lawyer

20   recommend and ask me to go ahead to the police station in

21   Arecibo, and we make a complaints against the drug dealing from

22   Arecibo, Puerto Rico for corruption, for planting the drugs and

23   guns inside my mother's house and arrest me.  That complaint

24   that we make went to the Internal Affair's Office in San Juan,

25   Puerto Rico.  And because of my complaint and all the people's

1  complaint, the federal authority initiate an investigation

2  against those detectives from that police station in Arecibo,

3  Puerto Rico.

4       When the federal authority finally got the search

5  warrant, they raided that police station.  The federal authority

6  find multiple guns and drugs hiding in different places inside

7  that police station that those officers use to fabricate cases

8  to people, most likely planting that drugs and guns in people's

9  property like houses and cars and illegally arrested those

10  people, and I was one of those people that they arrested in

11  2006.  The federal authority from Puerto Rico did a great job.

12  They dismantle and eliminate a danger criminal or gun section of

13  corrupt police officer that operate in Arecibo, Puerto Rico.  I

14  don't got the evidence with me to prove that, but everything is

15  in record in Puerto Rico court, also in the Internal Affair

16  Office in San Juan, Puerto Rico.

17       Thanks to the federal authority, there were a lot of

18  proof and evidence.  They indicted and arrested multiple police

19  officers from Arecibo, Puerto Rico for corruption.  That City of

20  Arecibo had to close that police station down.

21       Your Honor, when several corrupt detective find out

22  that I was the one that made the complaint against that police

23  station, I became the enemy and the target.  And all the corrupt

24  officer that don't got indicted and arrested for that corruption

25  went after me and fabricate me another case in 2008, which my

41

1    lawyer, Cesar Saraso, proved beyond a reasonable doubt that this

2    officer lie and perjury.  And one of those officer was present

3    that day that I got arrested for this case in Puerto Rico.  When

4    the honorable judge (indiscernible) from Arecibo, Puerto Rico in

5    my bench trial, her intelligence and knowledge about the law,

6    she clearly see all the lies and perjury that those officers and

7    witnesses intentional committed in her court.  And being

8    impartial and professional, she dismissed that case and all the

9    accusations that those officers make against me.

10   When I live (indiscernible), one of the detective from

11   Milwaukee, Wisconsin testified under oath in this court in trial

12   that they was in charge of this case and investigation are the

13   Puerto Rico police.  My lawyer, Jim Birdsall, mention it in

14   trial that this case was an ambush against me.

15   Your Honor, the Puerto Rico police had a lot to do in

16   this case.  Most likely, they are retaliating against me because

17   the FBI or the federal authority arrested and indicted multiple

18   police officer in Puerto Rico.  Your Honor, the federal

19   authority dismantle and eliminate criminal or gun section of

20   corrupt police officer that operate in Arecibo, Puerto Rico, and

21   it's still a lot more to do.

22   Juan Maldanado, he used to work in that police

23   station, and he was also on the investigation.  They low his

24   rank down from a detective to a regular police officer when the

25   City of Arecibo closed that police station down for corruption.

1  They move Juan Maldanado to Barceloneta, Puerto Rico where he

2  work as a police officer and became friends with Jesus

3  Rivera-Uverga and Oscar Colon Cuevas, which they both work at

4  municipal police station in Barceloneta, Puerto Rico.  And most

5  likely, they are corrupt police officer, and both of those two

6  detective are involve in this case.

7         That police station in Barceloneta, Puerto Rico where

8  the Officer Jose Rivera-Uverga and Oscar Colon Cueva work or

9  used to work, that police station was also on the investigation

10  for corruption.  Oscar Colon Cuevas and his partner are the one

11  accusing me of multiple crime, including this case.

12         Those officer are accusing me with false allegation

13  that I shoot at them, that I shoot at them with a gun, lying

14  under oath when they was the one that shot the car allegedly I

15  was driving.  The bullet impact that car several time.  They

16  shot to kill.  Those officer should get a lying detection test

17  so you can see, Your Honor, how liar and corrupt those officer

18  are.  And the same police station, one officer shot himself and

19  accuse somebody else saying that that person shot him.  That's

20  how corrupt and danger this officer are.

21         You can see in my PSI report that I was never charged

22  or accused of any crime in Puerto Rico court because when they

23  said that those allegation happen, most likely those officer was

24  being investigate for being part for a gun section of corrupt

25  police officer that operate in Barceloneta, Puerto Rico.

43

1           A lot -- A lot of police officer are angry at me

2   because of my complaint.  A lot of police officer got indicted

3   and arrested for corruption in Puerto Rico.  Those officer from

4   Barceloneta, Puerto Rico.  Also, those officer from Barceloneta,

5   Puerto Rico also got arrested for stealing property and money.

6   They was also stealing everything from the police station

7   evidentiary room where they work as police officer, and they was

8   also involve in a lot of criminal activity.  Those officer got

9   arrested for that corruption, including Oscar Colon Cuevas and

10  several other police officer from that police station in

11  Barceloneta, Puerto Rico where those officer, they came from

12  Puerto Rico to Milwaukee, Wisconsin and testify against me and

13  this court and trial.  That's why I was never charged or accused

14  of any crime in Puerto Rico.

15          They Government and authority in Puerto Rico know

16  about that corruption.  And by the law, the state and federal

17  court in Puerto Rico don't allow evidence or cases that

18  corruption police officer are involved because such evidence is

19  tainted with corruption.  Most likely sooner or later, the

20  federal authority are going to close that police station in

21  Barceloneta, Puerto Rick where like they did in Arecibo, Puerto

22  Rico.

23          I don't -- I don't understand how the U.S. Attorney

24  Mario Gonzales has said the evidence and present part of the

25  evidence to you and this Court in trial acknowledging that

1  corruption.  Because my lawyer mentioned that.  My lawyer

2  mention about that corruption several times in my case in this

3  court and also send him the news article from their arrests.  I

4  don't have the knowledge if Mario, the U.S. Attorney, brought

5  that situation to you attention and tell you about that

6  corruption.  Most likely, he's trying to cover up, justify the

7  corrupt police officer action and the criminal activity that

8  those officer committed in that police station in Barceloneta,

9  Puerto Rico.

10      And, Your Honor, my lawyer prove beyond reasonable

11  doubt that those officer lie to you under oath in this court in

12  trial about the evidence and everything that was used against me

13  in my trial.  Those officer show no respect to you or to the

14  United States Federal Court.  Those officer and Oscar Colon

15  Cuevas, the corrupt officer, they was together that day when

16  they confiscate the car, allegedly find the evidence.

17      When the U.S. Attorney Mario Gonzales find out about

18  the arrest and corruption that Oscar Colon Cuevas was involved,

19  Mario took that corrupt officer out of the case and act like he

20  was never there.  He knew -- He knew that you, Your Honor, are

21  not going to allow or accept any evidence that corrupt police

22  officer are involved.  Then, the U.S. Attorney use Oscar Colon

23  Cuevas' partner for testimony against me in my trial.  I don't

24  know if that is even legal that one of those officer are accused

25  of corruption also arrested and convicted.  And both of those

1  two officer was together in that incident, and they both had

2  access to the evidence and, Your Honor, one of those officer --

3  They, clearly, intentionally and purposefully lied to

4  you and commit perjury, which my lawyer instantly proved that

5  beyond reasonable doubt.  They lie under oath about the many

6  receipt for evidence, which that evidence was never presented to

7  this Court when my lawyer asked for that evidence.  That was a

8  lie that that evidence was stolen from his personal car.

9  Your Honor, I respect your decision of believing those

10  officer because you might think that they are some honorable

11  officers, but they are not.  Your Honor, with the power that you

12  got and influence in the federal environment, that with one call

13  that you make, you can easily verify or find out about the

14  arrest, corruption that took place in that police station in

15  Barceloneta, Puerto Rico and for what those officers were

16  accused and arrested.

17  Your Honor, can you, please, take a couple minutes and

18  log in in internet.  Oscar Colon Cuevas, corrupt police officer

19  from Barceloneta, Puerto Rico, so you can see or read about the

20  Indictment, arrest and corruption.  It's possible that you got

21  some honorable friends sitting on the bench in Puerto Rico

22  court.  Before you sentence me please can you search for the

23  truth and please can you have somebody make a call so you can

24  find out about Oscar Colon Cuevas and who he is.

25  Abner Valcarcel testify under oath in this court in

46

1  trial that he was in charge of this case and investigation

2  aren't the Puerto Rico police, that he was just assisting them.

3  Most likely, he lied under oath is a possibility, and Abner

4  Valcarcel and Evelyn Lazo are the ones in charge of this case

5  and investigation.  Both the Puerto Rico police also play a good

6  role in this case.  I never had an opportunity to see the

7  statement that those officer presented to the grand jury to have

8  me indicted so we can find out who they tell the grand jury was

9  in charge of this case and investigation.  Abner Valcarcel and

10  Evelyn Lazo also acknowledge that the full statement from

11  Rodolfo Duenas, the key witness.  I ask my lawyer why he don't

12  call Evelyn Lazo to testify under oath.  You also can clearly

13  see in my discovery that Rodolfo give the detective a false

14  statement against me.

15       Rodolfo say that I give Ricardo Rivera some cocaine

16  and money for him; that Ricardo took the drug and money and give

17  it to him, to Rodolfo, that I send him that drug and money.  My

18  lawyer -- My lawyer prove beyond reasonable doubt that that was

19  a false allegation against me and Ricardo because Ricardo was

20  already incarcerated in jail when Rodolfo say that that drug

21  deal or transaction happened.

22       My lawyer also prove beyond reasonable doubt that

23  Rodolfo isn't a reliable witness.  He, Rodolfo, even admit that

24  on occasion he lied to authority when he's in trouble to get out

25  of trouble, and he did it once again in this case, lying to the

47

1 detective so they can drop his charges, which they did. And he

2 got away, once again, saying that that drug was mine, saying

3 that that drug was mine when it was not mine. The detective,

4 Valcarcel, and Evelyn Lazo knowledge that that was a false

5 allegation from Rodolfo Duenas.

6 My discovery, clearly, show that when those detective

7 check the name of Ricardo Rivera in the computer to find out who

8 he was, pop out that Ricardo was already incarcerated in jail

9 when the key witness say that that drug deal or transaction

10 happened. And the officer, Abner Valcarcel and Evelyn Lazo,

11 still used the false testimony against me to have me indicted

12 acknowledging that was a false allegation or statement. Those

13 detective presented a false statement like it was true knowing

14 that that was a lie. You can, clearly, see the evidence of that

15 false statement being used against me in my discovery on

16 Page 000316. And not only that, you were, those detective also

17 did an illegal photo lineup showing Rodolfo only two photos,

18 Ricardo Rivera photo or pictures and somebody else picture or

19 photo.

20 They are, most likely, by the law when they do a photo

21 lineup, they supposed to use, at least, from four to six photos,

22 if I'm not mistaken. And being only two photos or pictures,

23 Rodolfo still picked the one person.

24 Now discovery, clearly, show Abner Valcarcel and

25 Evelyn Lazo coaching and coercing Rodolfo to pick Ricardo's

48

1  picture or photo basically telling Rodolfo that picture that you

2  pick is not Ricardo.  It's not Ricardo's picture or photo.  That

3  other one, that's Ricardo.

4       Even Alexandra, the interpreter, say how they can do

5  that, wow.  Even Alexandra can tell you about the lies, perjury

6  and corruption going on in this case.  Your Honor, that's not

7  right.  I'm not -- I'm not sure, but I believe that that is

8  illegal and corrupt.  That is, most likely, obstruction of

9  justice.  You can also find the evidence in my discovery or in

10 the transcripts from Alexandra on Page 8010056 and also on

11 Page 8010057 and also on Page 0000.  Those officer break the law

12 in so many ways.  It is incredible how they got away with that.

13 They are abusing the power and authority that the Government are

14 giving them.  Those officer knew that Rodolfo was lying since

15 day one.  I hope that one day all this corruption come to light,

16 and somebody put a stop to that corruption in the City of

17 Milwaukee, Wisconsin.

18      And, Your Honor, those officer from Puerto Rico and

19 Puerto Rico court, they had no credibility, which a lot of the

20 evidence are in Puerto Rico court.  The honorable judge in

21 Puerto Rico don't allow any of the court corruption or anything

22 illegal or anyone doing from any detective, district or U.S.

23 Attorney or anybody else.  That's why in 2006 and also in 2008,

24 the honorable judge dismiss both of those two cases in Puerto

25 Rico.

1        As you can see in the PSI report, the honorable judge

2   find me innocent because those officer and witnesses lie in that

3   court.  Most likely, that's why those officer came from Puerto

4   Rico to your court thinking that you were never was going to

5   find out about that corruption that took place in that police

6   station in Barceloneta, Puerto Rico because that corruption

7   happened in Puerto Rico.

8        The U.S. Attorney never did the effort to investigate

9   about that situation and tell you about that corruption or the

10  involvement of Oscar Colon Cuevas in this case just to have me

11  indicted and convicted.  My lawyer bring that issue to this

12  Court, and he did a great job to find out about all this

13  corruption and illegal activity that those officer committed in

14  this case.  He also find out about the fingerprint analyst being

15  fired from his job as a fingerprint analyst, most likely, for

16  something suspicious or illegal as his job as a fingerprint

17  analyst.

18       As the tainted and corrupt evidence was, most likely,

19  passed around after or before he got fired to another

20  fingerprint analyst from the same agency to one of his co-worker

21  or friend, and his corrupt evidence was used against me in my

22  trial.  It's possible that with the power that you got, Your

23  Honor, you can easily verify or find out about the fingerprint

24  analyst and for what he was being investigate and fired.

25       Please, Your Honor, can you ask the U.S. Attorney that

1  don't lie to you and tell you the truth if something strange and

2  suspicious that the U.S. Attorney Mario Gonzales do not want to

3  send an (indiscernible) where they say they had my alleged

4  fingerprint analyzed from a different agency where they accuse

5  my alleged fingerprint got damaged, so they can use the photo

6  fingerprints that the fingerprint analyst that got fired too

7  and, most likely, analyzed that photo and use it against me in

8  my trial.

9         The U.S. Attorney, most likely, know that that

10 fingerprints is not mine.  There's something fishy and corrupt

11 in that fingerprints.  If the internal affair are really to

12 investigate this case, they are going to be surprised of all the

13 corruption that are going on in this case.  Please, Your Honor,

14 can you have the internal affair investigate this case.  I know

15 and I believe that you got more power than the U.S. Attorney in

16 this court.

17        Please, Your Honor, can you analyze everything that I

18 say because it's true, and it's a lot of fact that prove that in

19 this case.  I believe, I trust and I got faith that you can make

20 that happen.  And can you, please, ask the U.S. Attorney, Mario

21 Gonzales, to tell you the truth about the fingerprint analyst

22 and also about the corrupt police officer from Puerto Rico

23 because he knows the truth.

24        Your Honor, it's a lot of corruption, lies and perjury

25 that these officer and witnesses committed in this case.  I am

1   afraid of those detective and the U.S. Attorney. I fear for my

2   life, freedom and safety because I'm leaving and also know what

3   those officer are capable to do. They got the power -- Excuse

4   me. They got the power, intelligence and connection to make up

5   evidence and false statement to easily convince any judge or

6   jury to find an innocent person guilty like the way they do in

7   this case with me and who know to how many other innocent

8   people. That's why I decide to have a bench jury instead of

9   jury trial because you, Your Honor, have more intelligence and

10   integrity and knowledge about the law than those 12 people from

11   jury with all the respect that the jury deserve. I really was

12   hoping that you will see all this corruption, lies and perjury

13   that those officers and witnesses committed in this case and

14   also in this court.

15        This case is based on false allegation from witnesses,

16   detective and even the U.S. Attorney. If they see that I'm

17   innocent, most likely they turn their heads around and act like

18   they don't see nothing. They are not going to turn against each

19   other for a guy like me from Puerto Rico with a criminal record.

20   Your Honor, it's hard for us to prove our innocence. Sometime

21   or most of the time, we don't get the opportunity to get a bail

22   bond if we don't got nothing to offer or cooperate with the

23   district attorney -- I mean with the U.S. Attorney. When we

24   incarcerated in jail, it's impossible for us to collect evidence

25   so we can prove our innocence and have a fair trial.

1      Your Honor, the U.S. Attorney and those detectives and

2  witnesses lies and perjury are more credible and convicting

3  (indiscernible).  I pray to God that one day all this racism,

4  discrimination and hate against minority, Latinos and black is

5  stopped in the United States of America even if everyday seem

6  like it is far and far away.

7      I also pray to God that in my appeal motion somebody

8  see all this corruption, lies and perjury that they committed in

9  this case, and I hope if you can, Your Honor, or somebody else

10  please ask the internal affair to investigate this case.  They

11  are going to find out about the corruption from the Puerto Rico

12  police, the lies and perjury from the detectives under oath,

13  plus the detective coaching and coercing witnesses, the lies and

14  perjury from the key witness and many other issues like the

15  corruption, fingerprint analysis, the false statement or

16  evidence presented to the grand jury and to you, Your Honor, and

17  et cetera.

18      Please can you take in consideration that I'm innocent

19  and please can you take in consideration the new law with the

20  Democrats and Republicans and also the President passed, and

21  please can you go below my mandatory minimum for being not a

22  violent crime.  And I'm sorry.  I know that I'm asking for too

23  much.  Your Honor, I'm really, really scared, and my life is in

24  your hand.  And please can you take out if you can the 851

25  enhancement that the U.S. Attorney put against me in retaliation

1   because I decide to go to trial.  I don't take that plea and

2   decide my right to go to trial and don't take that plea, if it's

3   possible and if you got the power to do so.

4           And please don't let the U.S. Attorney send me to

5   prison for more time.  I've been incarcerated inside of Kenosha

6   County Jail cell for four years for a crime that I don't commit.

7   Being locked up inside a county jail is really, really hard

8   time, especially when you innocent.  Your Honor, I got four

9   beautiful daughters, which I'm proud of them because one is

10  almost finished college, and the other one is about to start

11  college, and I really want to get out of jail so I can keep

12  helping them.

13          If you can bless me with the opportunity -- If you can

14  bless me with that opportunity, I pray to my Lord and Savior

15  Jesus Christ, and I got faith that he's going to touch your

16  heart this afternoon.  Honorable Judge Pepper, I also want to

17  say that I don't understand how those detectives and witnesses

18  break the law so easily when the lawyer with a lot and work and

19  effort, that I'm sure you know because you was a great lawyer

20  before, is sad how my lawyer, clearly, prove beyond reasonable

21  doubt that these detectives and witnesses lied to you and lie in

22  this court under oath committing perjury, which in the United

23  States Federal Court by the law is illegal and penalized as a

24  crime.  I don't know, and I don't have the knowledge if that law

25  is only used against the defendant and not used against the

1    accusers or if the United States Federal Law is for everyone

2    equally.

3         I also don't know if those detectives and the U.S.

4    Attorney are really are above the law.  Your Honor, in my case

5    and part of the evidence that they say they had or find, one of

6    the officer involved at that time was later investigated by

7    federal authority for corruption that lead to his arrest, accuse

8    and convicted of a crime for illegal activity in his job as a

9    police officer, and another one was fired for doing illegal

10   activities also.  And from the fingerprints to the men in

11   receipt all the evidence was used against me in my trial.  I

12   just like to know if the detectives and witnesses are going to

13   be charged or accused for lying under oath in this federal court

14   with perjury or if those detective with criminal intentions,

15   acknowledging that there is a crime had the authority to break

16   the law and lie in the federal court.

17        If nobody do anything about that, they going to

18   continue breaking the law.  Most likely, they not have to be

19   doing this for years and years and getting away with that

20   disrespecting the federal court.  I believe, Your Honor, that

21   you deserve a lot -- a lot more respect than that.  The U.S.

22   Attorney believe otherwise because, most likely, he knew that

23   they was lying and, most likely, he allowed them to lie and

24   perjury in this federal court.

25        I also want to tell you that I'm sorry.  I apologize

1   if I didn't respect you somehow with the letters that I wrote

2   you or anything I did not say, and I want to say -- and I also

3   want to say that I'm really, really hurt honestly.  I was

4   expecting a totally different outcome considering the facts that

5   I've been incarcerated for over four years and might have to go

6   through more incarceration for drug I had no dealing with.

7         Your Honor, if I was guilty, I could have accepted the

8   plea agreement and the five-year mandatory minimum that was

9   offered to me two years ago.  And with the programs and the good

10   time that the BOP have to offer, I would have been home to my

11   family already.  But because of my innocence, I decide to fight

12   for my life.  My mother is sick currently living in Puerto Rico

13   suffering due to the tragedy that the hurricane cause, and I got

14   four beautiful daughters and my (indiscernible) are affecting

15   them.

16         Overall, Your Honor, I'm here asking for leniency

17   hoping that you take this all in consideration and consider time

18   served for me and help me get back to my family.  And please,

19   Your Honor, don't punish me with extra time like the U.S.

20   Attorney want to do.  He's being vindictive towards me trying to

21   force me to take a plea, trading me with an 851 enhancement for

22   the reason that I decide to exercise my right to go to trial.

23   You can, clearly, see that the U.S. Attorney through the 851

24   enhancement option a few months before my trial, almost all four

25   years that I've been incarcerated.

1    And, Your Honor, those detectives, Abner Valcarcel and

2   Evelyn Lazo, and those detectives from Puerto Rico are capable

3   to do and they did a lot of illegal stuff to have me convicted,

4   from coaching and coercing witnesses to lie under oath in a

5   federal court.  They should be investigate by the federal

6   authority or the internal affair for corruption for fabricating

7   cases, planting evidence and making false statement in people's

8   cases like mine.

9    Your Honor, they planted -- They planted and, most

10  likely, presented a false fingerprint and a false statement from

11  the key witness to the grand jury to have me indicted.  Those

12  detectives and, most likely, the U.S. Attorney Mario Gonzales,

13  they should be investigate by the federal agency internal affair

14  for conspiracy for conspire to commit perjury in this federal

15  court.  The internal affair or any other federal agency can find

16  all the evidence that they need against those detective crystal

17  clear in my discovery and also in the transcript.

18   This is one -- In one of the letters that I wrote you,

19  I asked for an evidentiary hearing to suppress the evidence so

20  we can show you all this corruption and illegal issues that are

21  going on in this case before trial.

22   THE COURT:  Mr. Pagan, I'm sorry to interrupt you.

23  I'm just wondering, I don't want to cut you off, but there may

24  be some people who need a bathroom break because we've been here

25  quite a while.  And so I just wanted to check to see if anyone

1  needed to take a break before Mr. Pagan continues.  Anybody need
2  a minute?
3      MG. GONZALES:  It depends on how much longer we're
4  going to go, so maybe now would be a time to take a break, if
5  that's acceptable.
6      THE COURT:  I will take a break long enough for people
7  to use the facilities and then just come back when you're
8  finished, and I'll let you continue, Mr. Pagan.
9      (Brief recess taken.)
10     (Back on the record.)
11     THE COURT:  All right.  So everybody had a brief
12 break, and we're all back in the courtroom now.  Mr. Gonzales
13 and Mr. Birdsall are here.  I'm sorry to have interrupted you,
14 Mr. Pagan.  Go ahead.
15     MR. BIRDSALL:  One brief housekeeping thing, Judge.
16 First of all, he's almost done.  I discussed that with him just
17 as we took this break.  But I also have a call I was supposed to
18 get on at 4:00, and I'm just wondering -- I'm going to just --
19 I'm not trying to say we should hurry this, not at all, but I
20 just want to know, approximately, if he's just about done, what
21 time we might be done so I can let that other court know?
22     THE COURT:  I have no earthly idea.  Mr. Gonzales may
23 want to give a response to what he's just heard.  It wouldn't
24 surprise me if he did.  I don't know if you're going to have any
25 input, and I may have a couple of comments.  So I wish I could

58

1  predict that to you, Mr. Birdsall, but I didn't anticipate we

2  would still be having this discussion at this point either.  So

3  I don't mean to tie you up with our other obligations.  I've

4  been there, done that.

5          MR. BIRDSALL:  I will have it covered, no problem.

6          THE COURT:  Thank you.

7          DEFENDANT:  Your Honor, I just want to say I'm sorry.

8  I'm kind of scared and nervous, and I just want to let you know

9  what's happened between the situation because you're here this

10 side of the law.  The story is a lot of facts that prove what

11 I'm saying.  A lot of facts here and in Puerto Rico about the

12 corrupt police officer, about the fabricating of my cases, the

13 planting the evidence, the complaint I made to the internal

14 affair.  They raided the police station finding guns and drugs

15 hiding in different places.  A lot of police officer got

16 indicted and arrested and these come from the beginning because

17 this officer is mad at me because of what I did.  I already

18 spoke about that.  I'm about to finish.  Can I finish?

19         THE COURT:  I told you, Mr. Pagan, you could have as

20 much time as you wanted.

21         DEFENDANT:  This is why in one of the letters that I

22 wrote you I asked for evidentiary hearing to suppress the

23 evidence so we can show you all these corruption and illegal

24 issues that are going on in this case before trial.  I also

25 asked my lawyer numerous and numerous of times that I want to

59

1  have evidentiary hearing to suppress the evidence and was

2  denied.

3         I also feel that it's not fair to me that the

4  mandatory minimum now that the U.S. Attorney want to give me ten

5  years in prison over the time and penalty just because I decide

6  to exercise my right to go to trial.

7         Your Honor, I did it because I'm innocent, plus I want

8  you to see all this corruption and how those detectives and

9  witnesses intentionally and purposely lie and perjury under oath

10  in a federal court just to have somebody convicted.

11        I was not trying to hurt anybody to deserve all that

12  time that the U.S. Attorney is asking for.  Please, Your Honor,

13  can you take a consideration the five-year mandatory minimum

14  that was offered to me before trial, and please can you give me

15  time served and help me get back to my family.  My mother is

16  over 70 years old.  She got high blood pressure and diabetes,

17  and I was the one who take her to the hospital to get her

18  medication.

19        When the hurricane passed in Puerto Rico, the lights

20  went off in her house for months and months.  She trip and fall

21  and had an injury that give her from seven to eight stitches in

22  her forehead.  And not long ago she also had a little stroke.

23  And I got an 8 year-old daughter, and she got the condition of

24  Autism, and it's heartbreaking for me every time she tell me

25  daddy, when you coming home.

1           Your Honor, I'm not a violent person.  Please give me

2     -- Please can you give me the opportunity to start a new life

3     and Jesus Christ with my family.  God bless you and God bless

4     everyone and everyone family in this courtroom in the name of my

5     Lord and Savior, Jesus Christ.  I pray to him this morning to

6     touch you heart for you to believe what's fair in my sentencing.

7     And if you are not a believer in Jesus Christ, please, Your

8     Honor, don't take this as on offense.  Thank you.  God bless you

9     and God bless your family, and thank you for giving me this

10    opportunity to express myself for the truth.  Thank you.

11           THE COURT:  Thank you, Mr. Pagan.  Mr. Gonzales, a

12    number of the things that Mr. Pagan has addressed from a legal

13    standpoint I assume you know how I might respond to those, but

14    he has made certain factual allegations that while he's hinted

15    at them over the course of time that he's been in custody, this

16    is the first time that he has flushed them out.  And you don't

17    have to respond, but I'm happy to give you an opportunity if

18    there's anything that you'd like to comment on.

19           MG. GONZALES:  Well, I guess just so the record is

20    clear, he touched upon a number of things.  He talked a little

21    bit about racism and the impact that might have played.  I just

22    want the record to reflect, I know it doesn't reflect it, but

23    I'm a dark-skinned Hispanic.  I'm -- My life has been touched by

24    racism just like most people who are of my skin color, so that

25    is a non-starter.

1          As far as the allegations of corruption and regarding

2     the agents or individuals from Puerto Rico.  When this case

3     began, I was not contacted by the local police department in

4     Puerto Rico.  I was contacted by federal agencies as part of a

5     much larger federal investigation.  In fact, that investigation

6     is ongoing, and it continues.  And I do note that the Government

7     did continue to monitor some of Mr. Pagan's phone calls.  And

8     shortly after the trial, his -- Mr. Pagan indicates that, you

9     know, there was this -- that there wasn't that Abner Valcarcel

10    lied and they talked about this ongoing federal investigation.

11    Well, he called home.  And during that call home in April of

12    last year, he basically told people, Ericka Cordero, that she

13    should be on the lookout because the feds are conducting a much

14    larger investigation and referenced what was going on in -- in

15    court.

16         So for him to say that Abner Valcarcel lied about the

17    ongoing federal investigation or the federal authorities were in

18    charge of the investigation, that is, in fact, true.  And not

19    only is it true, he found it truthful enough that he contacted

20    folks in Puerto Rico to let them know that there is this ongoing

21    federal investigation.

22         As far as the issue of corruption, I think it came out

23    during the trial that the officer that testified -- None of the

24    officers that testified that were on the Government's list were

25    officers connected in any way to -- The only evidence of

1    corruption I found was that there was an allegation that some

2    officers and support staff had taken some items.  Regardless of

3    whether they were abandoned or in the property room being that

4    they took advantage of and used in another capacity.

5            And so -- But one of the officers that did testify in

6    this case I think testified that he was one of the officers

7    that, in fact, identified those individuals, the fellow officers

8    that were involved in that investigation.  So as far as

9    corruption goes, we did a thorough investigation.

10           I contacted Puerto Rican authorities.  Agent Lazo

11   contacted Puerto Rican authorities, and we saw no evidence of

12   any corruption as it touched upon Mr. Mr. Pagan's case --

13   Medina's case.  So even beyond that corruption angle, the

14   evidence in this case was developed.  And the reason we

15   prosecuted this case here was because the evidence was here.

16   And that evidence consists of Mr. Duenas, and it also consisted

17   of the investigation of the postal service.

18           The postal authorities were contacted by federal

19   agents in Puerto Rico, and that's how I got involved in it.  The

20   postal service conducted this investigation.  They did the

21   observation of Mr. Duenas.  They let the one package go through.

22   They kind of figure out, okay, there is corroboration of what's

23   going on and what we've been told.  We'll just wait for the next

24   package.

25           That next package that came through, that was the

1   package with the 1.6 kilograms of cocaine that was sent from

2   Puerto Rico that postal inspectors, not HIDTA, not anyone else.

3   The postal inspector who testified in court testified that he --

4   They delivered that package.  They executed the search warrant

5   simultaneously with the delivery of that package with

6   Mr. Duenas, and then the postal service took that package and

7   forwarded it off to -- for analysis.  It was done by the Postal

8   Inspection Service.  And as the Court may remember, the package

9   was sent off.  They found -- They took fingerprints and

10  photographs of those latent prints.  And what happens in this

11  process is, they submit those photographs for an analysis into

12  the AFIS machine.  A computer views the -- what fingerprints

13  were recovered were sent and identifies the possible suspect.

14  It's only when Mr. Medina's fingerprints were identified by the

15  computer that they were handed off to another agent or to a lab

16  analyst.  And I was in consultation with that lab analyst

17  because we thought this case was going to go to trial a little

18  bit earlier, and I was in consultation with that lab analyst,

19  and we were preparing for his eventual testimony.  And he was

20  never fired for any wrongdoing.  He wasn't fired at all.  I had

21  confirmation not only with him but with the supervisor to

22  confirm that he was leaving for a better paying job in another

23  agency.  He was highly qualified.  He had a long and

24  distinguished academic career.

25              So the case was then handed off to the woman who came

1   in and testified before this Court.  And she is the classic rags

2   to riches kind of great American story.  She's a woman who

3   started in the postal service and worked in the laboratory, has

4   a little bit over a high school degree and began an

5   apprenticeship program and worked in that agency and continually

6   stayed in that agency for some 30 years to be a lab analyst and

7   testified in this court as to all the schooling and the training

8   that she was given.  And she had no reason to fabricate any

9   evidence.  She had no relationship to the previous analyst, and

10  she conducted her own analysis before coming to court.  And that

11  caused a little bit of concern in that she turned over some

12  documents a little later than what they would normally be done,

13  and her independent analysis identified the defendant's

14  fingerprints.

15          So it wasn't -- We weren't relying on officers in

16  Puerto Rico or anyone else to place the defendant's involvement

17  in this case.  We looked up the physical evidence as it directly

18  tied to the defendant.  So really, the fingerprints in

19  conjunction with what Mr. Duenas was telling us, and he was

20  arrested.  He gave a statement.  He identified the source before

21  any fingerprints were analyzed.  Things were sent off to the lab

22  after he had given his information, and the Postal Inspection

23  Service did their own investigation, and that's the name the

24  computer came up with first so that the two analysts could

25  compare.

1          So as far as the evidence is concerned, it had very

2     little to do with Puerto Rico, and the Government did do a

3     background check.  We didn't present any evidence that had any

4     involvement, and again this case was part of a much larger

5     federal investigation, and that investigation is still ongoing

6     as best I know, and it has -- and it wasn't run by the local

7     police department.

8          So based upon that information, I believe that -- I

9     just -- A lot of what Mr. Medina had to say was simply

10    accusations towards the detectives, myself, the lab analyst,

11    everyone involved in this case.  But when one looks at the

12    evidence in this case, the judge in this building who often said

13    the best way to tell how someone's going to act in the future is

14    how they've acted in past.  And when you look at Mr. Medina's

15    record, I think it speaks volumes unless the officer who he sold

16    controlled substances back in '95 was part of corruption or

17    targeting him, whether it was the officers that arrested him for

18    possession of marijuana on multiple occasions, possession of

19    cocaine, possession with intent to distribute cocaine back in

20    2002.  And then the multiple arrests that he's had since then.

21    So when one looks at the prior history and the facts of this

22    case, I think it's pretty clear that Mr. Medina has no one to

23    blame but for himself for continuing to be involved in the sale

24    and distribution of controlled substances.  That's it, Your

25    Honor.

1          THE COURT:  Thank you, Mr. Gonzales.  Mr. Birdsall,

2     anything before I speak?

3          MR. BIRDSALL:  Just briefly.  I didn't expect to retry

4     the case today, but a few items.  Mr. Gonzales says this case

5     had very little to do with Puerto Rico, but he just got done

6     asking you to impose a sentence higher than the mandatory

7     minimums based I think exclusively on a discussion about the

8     whole traffic stop escape thing in Puerto Rico.  So I think it

9     has a lot to do with Puerto Rico.

10          And just very briefly on a couple of items that jumped

11     out as I was listening to this.  There was definitely some

12     murkiness going on with the police officers from Puerto Rico.

13     And they were very cagy, as you may recall, about who was

14     handling this investigation.  And it really wasn't us, it was

15     people in Milwaukee.  The people in Milwaukee is like, no, it's

16     the guys down in Puerto Rico that are handling it.  And then

17     none of them, including Mr. Duenas, had anything to say about

18     the fact that he was out of custody and they would not talk

19     about his deal and he didn't have apparently, which just, you

20     know, strained any sort of credibility as far as I was

21     concerned.

22          So there was just -- I only mention that because there

23     was some talk in the parties here about the credibility of his

24     officers.  But there was a comment about the computers and the

25     prints.  Well, as I recall, the computer spit out 20 names, and

1    they only focused on his.

2           And finally, the lab analyst, there was just an

3    assertion that he just moved because he got a better job at a

4    different agency, but I distinctly remember and I'm sure this is

5    a matter of it's on the transcript somewhere.  But there was

6    without question in my mind that I'm remembering this correctly,

7    that there was an assertion that this gentleman was disciplined,

8    and that's why he wasn't available, disciplined in some form or

9    fashion.  We never found out why, but that happened.  And so

10   maybe that was an incorrect assertion back then, I don't know,

11   but I know that that happened.  So those are the only comments

12   that I have, Judge.

13          THE COURT:  It is not usual, it's not common, but it's

14   not usual for people to do what Mr. Pagan did in this case and

15   that's to decide that they want to exercise their constitutional

16   right to go to trial instead of plead guilty.  There is

17   absolutely nothing wrong with that.  Every single defendant who

18   is charged with a crime has a right to a trial if they want one.

19   They are entitled to under the Constitution, and I hope that I

20   don't ever punish anybody for making that choice.

21          I'd like to think I haven't.  I had several defendants

22   whom I've sentenced, and they come in and the Government asks me

23   for a particular sentence after a trial and the defense asks for

24   a particular sentence.  And other than the fact that someone

25   doesn't get a reduction for acceptance of responsibility under

1    the guidelines, I try not to treat anybody differently if they

2    were convicted after a trial than if they were convicted as a

3    result of a plea.  So I am -- Whatever sentence I'm about to

4    impose, I'm not going to impose a sentence to punish Mr. Pagan

5    for going to trial.  That is absolutely his right.

6              But I have to tell you I know Mr. Pagan that you've

7    been wanting to tell me a lot of that stuff for a long time.

8    And I promised you that I would give you the chance to do it,

9    and I just did.  But you started out your comments by saying you

10   hope that -- You're scared and you're nervous, and you hope that

11   nothing you say will offend anybody.  I'm curious as to how you

12   hope that some of the things you said wouldn't offend anybody?

13             For starters, you accuse an Assistant United States

14   Attorney of lying, of making up evidence against you, of

15   intentionally presenting perjured evidence.  Mr. Gonzales and

16   every other federal prosecutor, including me when I was a

17   federal prosecutor, has to take an oath to uphold the

18   Constitution and the laws of the United States.  It is a

19   prosecutor's job, despite what some not so good prosecutors

20   think.  A prosecutor's job is not to put people in prison.  A

21   prosecutor's job is not to get people convicted no matter what.

22   A prosecutor's job is to try to do justice, and I will tell you

23   that I have known both Mr. Gonzales and Mr. Birdsall for more

24   years than I would like to count.  And I have never known

25   Mr. Gonzales to do anything other than to try to do justice.  He

1  has come into this court before, and he has asked me to give a

2  lower sentence than he needs to.  He's come into this court

3  before, and he's told me that he thinks a charge maybe should be

4  dropped, like the evidence looked like it proved the charge but

5  then it turned out it didn't.

6          You come in here and you accuse the prosecutor of

7  committing crimes and violating the law.  That's offensive.  And

8  I realize that you said you hoped you didn't offend anybody, but

9  that is offensive.  You also came in and you started your

10  remarks by telling me what a wonderful job Mr. Birdsall did, and

11  I agree with you.  Mr. Birdsall has worked himself silly on this

12  case.  But today is the first day I've heard you acknowledge

13  that.  For as long as I've known you, you've been writing me

14  letters telling me that Mr. Birdsall is not coming to see you,

15  Mr. Birdsall is not filing the motions that you ask him to file,

16  Mr. Birdsall is not making the arguments that you ask him to

17  make.

18          Yes, you wrote to me and you told me you wanted an

19  evidentiary hearing.  I am guessing you also told Mr. Birdsall

20  that, and I don't know what the two of you talked about, and

21  it's none of my business.  I don't have any right to know.

22  That's between you and Mr. Birdsall.  But I would be willing to

23  bet that Mr. Birdsall gave you some advice about whether or not

24  legally a Motion to Suppress the Evidence would have any

25  likelihood of success.  And I'm willing to guess that the reason

1   that I never saw a motion like that was because Mr. Birdsall in

2   his professional opinion, did not think that it would help you,

3   and maybe he even thought it would hurt you.

4           I didn't deny you an evidentiary hearing, Mr. Pagan.

5   If Mr. Birdsall had asked for one, Mr. Gonzales might have

6   opposed it, but I would have made that decision at that point in

7   time.  We've had an attorney advising you for a long time on

8   this case, and you've tried to go around him, and you've tried

9   to in some cases work against him.  I suspect that

10  Mr. Birdsall's heart sank any number of times when I wrote him a

11  letter and said your client is writing directly to me again, and

12  he's not allowed to do that.  And I was upset about that not

13  because you were bugging me.  It's my job to read people's

14  letters and do whatever, but because you were hurting yourself.

15  You've said a number of things here today that -- that simply

16  are not accurate.  Your first -- Again, Mr. Gonzales made

17  mention of it.  You commented about racism.  Yeah, there's

18  racism in the United States.  You bet there is, and I'm guessing

19  it exists in Puerto Rico.  It exists in Milwaukee, and it exists

20  everywhere else.  But have you looked over at who the prosecutor

21  is?  Have you heard his name?  I'm not saying that people of

22  brown skin can't be prejudiced against other people of brown

23  skin.  But, you know, to say that Mario Gonzales prosecuted you

24  because your name is Alejandro Pagan and because you're from

25  Puerto Rico?  I -- That makes very little sense to me.

1      You -- You made the comment that you don't know

2   whether anybody looked into this corruption that you've talked

3   about.  Well as a matter of fact, one of the reasons that this

4   case has taken so long to get to trial and taken so long to get

5   to sentencing is that Mr. Birdsall asked me to delay the case

6   numerous times so he could look into the allegations that you

7   have made.  Mr. Birdsall did, in fact, look into them.

8   Mr. Gonzales looked in them because I ordered him to.  He would

9   have done it anyway even if I hadn't ordered him to, but I

10  ordered him to.  And you know what?  He did come back and

11  Mr. Birdsall came back with information and a newspaper article

12  about two officers in I think it was Arecibo.  I don't think it

13  was Barceloneta.  And Mr. Gonzales kind of talked about it, had

14  been taking things it looked like either the evidence inventory,

15  and they had been prosecuted, and they had been convicted.  So I

16  went through the reports of the officers who were present the

17  day you were arrested.  And I compared the names of the two

18  officers who had been charged with the names of the officers who

19  were present at your arrest, and they weren't the same officers.

20  No, they were not the same officers because I looked.  I can

21  only a imagine -- I think you shouldn't talk anymore, Mr. Pagan.

22  I think it probably won't help things, and I'm just being

23  straight with you.

24      Perhaps, you're absolutely right that there's rampant

25  corruption in the Arecibo Police Department, and maybe there was

1   even a police department that was shut down.  It seems to me,

2   though, that if you're asking me to go on the internet and do a

3   search and find information about that, Mr. Birdsall could have

4   done the same thing.  And he could have come in, and he could

5   have presented that evidence to me, or he could have handed it

6   to Mr. Gonzales, and you could have said, boy, look at this.

7   Look at what happened here.  Look at the names of these officers

8   who were charged and convicted.

9           You asked me several times to look into things, to

10  investigate things.  My role as a Judge, and I'm not saying this

11  as a cop out or a way to escape responsibility, but I'm not the

12  person who investigates things.  The prosecutor investigates on

13  behalf of the Government to make sure before he brings the

14  charges that he has enough evidence.  The defense attorney

15  investigates on behalf of you.  That's what his job is, and

16  Mr. Birdsall did that.  My job is to take the evidence that the

17  Government presents to me and the evidence that Mr. Birdsall

18  presents to me and then make a decision.  I did that.  I sat

19  there, and I listened to the evidence.  Mr. Birdsall cross

20  examined every single witness.  Mr. Birdsall tried to point out

21  places where he believed that people were not being truthful,

22  and I listened to all of that, and then I made a decision.  And

23  you indicated that you're sad about that decision, that you had

24  hoped it would go a different way.  I guess I can understand

25  that.

1          But I based my decision on the evidence that was in

2    front of me.  You've said to me today that you decided to have a

3    trial in front of me instead of a trial in front of a jury

4    because you thought that I was smarter and you thought I knew

5    more about the law, and you said that you thought I deserve a

6    great deal of respect.  Those words don't mean much to you

7    because you've not shown much respect for my intelligence today.

8    You seem to think that if you say flattering things to me and

9    you say nice things to me that I'll ignore the law, that I'll

10   ignore the evidence that was in front of me, that I'll change my

11   decision that I issued after the trial, that I'll take your word

12   for all these things that happened even though you've told me

13   several times you've got evidence of all these things.  I

14   haven't seen it.  If there's evidence of all these things, why

15   didn't you give it to Mr. Birdsall?  Why didn't Mr. Birdsall

16   give it to me?  All throughout your comments, you kept referring

17   to your discovery.  And you said if you look at Page 1801 of my

18   discovery, you'll see this.  Well, I don't have your discovery.

19   The Government gives the discovery to Mr. Birdsall, and you and

20   Mr. Birdsall look at the discovery.  And if there's something in

21   there I need to see, Mr. Birdsall points it out to me.

22          I don't have any of that.  So if I needed to see that,

23   it should have been presented to me.  I don't even have it now

24   to look at, and that is the way our system works.  The

25   Government turns over all sorts of things to the defense in the

1    discovery, and half of it the defense says, you know what, this

2    doesn't have to do with my client, this doesn't have to do with

3    my case, and they pick out the things that are important that

4    the judge needs to see or that the jury needs to see.  I don't

5    do that.  The prosecutors and the defense do that, and I have

6    not seen any evidence to support any of the things that you're

7    talking about here.

8              The fingerprint analysis, and again I've already made

9    my determination, but I think I, at least, ought to make the

10   point.  You know, you may recall that we finished your trial and

11   on the last day of trial I did not issue my verdict on the last

12   day of trial.  There's a reason for that.  Mr. Birdsall asked me

13   if he could submit the fingerprint evidence to an independent

14   fingerprint consultant, not the Government fingerprint

15   consultant, but an independent consultant.  And rather than

16   finish the trial and say, no Mr. Birdsall, we're done, we've

17   been working on this case for years, we are done.  I said, yes,

18   Mr. Birdsall, I'll let you do that.  And so we came back a

19   month-and-a-half later, I think, for me to issue the verdict.

20   By the way, the independent fingerprint examiner did not find

21   that they were not your fingerprints.

22             You said that you wanted me to please consider going

23   below the mandatory minimum of ten years.  And you mention the

24   law that the President recently signed in December.

25   Unfortunately, I cannot go under the mandatory minimum under

1    that law.  That law doesn't apply to you.  That law applies only

2    to defendants who have been convicted of crack cocaine, cocaine

3    base offenses.  Your offense involved powder cocaine.  So that

4    law doesn't allow me to go under the mandatory minimum.  There

5    is no law that allows me to go under the mandatory minimum,

6    except if a defendant cooperates and provides substantial

7    assistance to the Government.  You've not done that.  That was

8    your choice.  You have absolutely every right to make that

9    choice.  But because you made that choice, I do not have the

10   legal authority to go under the mandatory minimum of ten years.

11           You asked me to give you the opportunity to do a

12   time-served sentence.  Again, I don't have the authority to do

13   that.  You told me that you've been praying and that you've

14   asked God to touch my heart, and I appreciate that.  But what

15   that implies is that if I feel sorry for you or if I feel

16   sympathy for you, that I'll ignore the law, and I'll issue a

17   sentence that I don't have the authority to issue.

18           I believe it's important for judges to be

19   compassionate.  I believe it's important for judges to feel

20   empathy.  And I know you've suffered while you've been in

21   custody.  You've told me.  You've been telling me for years.  I

22   found out from the Presentence Report that you have a family,

23   two daughters in Puerto Rico, two daughters here.  I have no

24   reason to think that they aren't wonderful.  I'm heart broken to

25   hear what your mother went through in Puerto Rico.  I know so

1  many people who suffered after Maria, and it sounds like your

2  mother was one of them, and I'm sorry to hear that.  I am.

3        But no matter how compassionate or empathic I can be,

4  I have to follow the law.  That is my job.  And in this case,

5  the law says that the mandatory minimum sentence that I can

6  possibly impose is 120 months, is ten years with credit for the

7  time that you've been in.

8        Mr. Gonzales has asked me to go above that, and he

9  makes some very good points.  Mr. Pagan, this is your seventh,

10  as I count them, drug convictions.  And a number of those were

11  here in Milwaukee, which you've talked a lot today about alleged

12  corruption in Puerto Rico in your home town in Arecibo.  And I

13  don't -- I have no idea if that's happening or not.  You know

14  and I've been to Puerto Rico, it's been to walk around old San

15  Juan, so I don't know.  But in Milwaukee, you've got convictions

16  dating back to when you were a teenager.  And not only do many

17  of them involve drugs, but many of them involve resisting

18  officers.  There's been some talked, too, about the allegations

19  that when you were arrested in Puerto Rico on this offense that

20  you fled and that you fired shots at the officers.  And you've

21  said no, it wasn't me.  I didn't fire shots at them.  They fired

22  shots at me.  I don't know.  I wasn't there.  I don't have any

23  right to say.  But what I do know is that you've resisted

24  officers in the past.  And there was one particular conviction

25  and I think it was in the 2002 drug conviction where there was

1    an officer who was injured in the process of arresting you on

2    that offense and had to go to the hospital.

3            That is not to say -- I'm not accusing you of being a

4    violent person, but I am saying that there's an extensive

5    history that occurred before you ever went back to Puerto Rico.

6    This offense by itself if all I look at is shipping a

7    kilo-and-a-half of cocaine to Milwaukee or maybe two,

8    two-and-a-half, I don't know how much it was.  That's not the

9    most serious drug crime I've ever seen.  But you have an

10   extensive history both here in Wisconsin and in the

11   Commonwealth.  You've got an extensive series of arrests in the

12   Commonwealth.  Some of them didn't result in convictions.  Maybe

13   that's because you were innocent.  Maybe that's because of

14   technicalities, I don't know.  But there are a number of police

15   contacts there.

16           And a lot of what you've said today, blaming the

17   prosecutor, blaming the officers, not today but over the past

18   blaming your lawyer, blaming everybody else for how you got

19   here, it doesn't show somebody who takes responsibility for his

20   part in getting himself here.  I've had people go to trial

21   before as I told you in the beginning.  And when they get

22   convicted, they come in here -- and I've had people at

23   sentencing who have said, Judge, look I went to trial because I

24   was facing a lot of time, but I'm sorry for what happened.

25           Now, I realize you're telling me you didn't do this,

1    so I guess you can't say that you're sorry for what happened.

2    But it's one thing to say, Judge, I can't admit that I did it

3    because that wouldn't be true.  And it's another thing to turn

4    around and blame everybody around, except you.  Blaming a

5    fingerprint examiner who has no reason to have anything to hold

6    against you.  Blaming the postal inspectors who have no reason

7    to have anything to hold against you.  Maybe the police officers

8    in Puerto Rico had a reason to be upset with you because you

9    reported their conduct.  Why would the postal inspectors want to

10   get you in trouble?  Why would the fingerprint examiners want to

11   get you in trouble?  Why would the local officers here in

12   Milwaukee?  Why would the HIDTA officers want to get you in

13   trouble?  What's in it for them?  What's in it for Mr. Gonzales?

14   He gets paid his salary whether he prosecutes you or somebody

15   else.  If he didn't have your case, he'd have 50 others.

16              I believe that an appropriate sentence under these

17   circumstances, I can't go below ten years.  I'm taking into

18   account, Mr. Pagan, your history, taking into account the fact

19   that there are some positives.  You've got a family who cares

20   about you.  But I also am taking into account the fact that your

21   reaction to this case has not just been to deny your guilt, but

22   to blame everybody else.  I think the appropriate sentence is

23   138 months in custody followed by -- I believe the maximum,

24   Ms. Morgan you can correct me if I'm wrong, is five years of

25   supervised release?

1          PROBATION AGENT:  Yes, Judge.

2          THE COURT:  Thank you.  I'm required to impose a $100

3   special assessment.  Under the law, I don't have an option

4   there.  I'm not going to impose a fine.  I think the Presentence

5   Report indicated that Mr. Pagan does not have sufficient funds

6   to be able to pay a fine, so I'm not going to impose that.

7   Mr. Birdsall, did you have an opportunity to review the proposed

8   conditions of supervised release, which are at the back of

9   Presentence Report?

10          MR. BIRDSALL:  Yes, I'll confess I didn't give them a

11  super close look.  Is there something in particular you wanted

12  to --

13          THE COURT:  What I will do is I'll give you until --

14  how about a week from today to let me know if there are any of

15  those conditions to which you object.  I reviewed them.  I don't

16  see any it seems to me to raise any issues, but I'll give you

17  until the end of the day this coming Monday to let me know if

18  you object to any of them, if Mr. Pagan objects to any of them.

19  If you do, let me know, and I'll consider whether or not to

20  impose any conditions to which you object.

21          MR. BIRDSALL:  Okay.

22          THE COURT:  Mr. Gonzales, am I recalling correctly,

23  there were no other counts to dismiss; is that right?

24          MG. GONZALES:  That is correct, Judge.

25          THE COURT:  Mr. Birdsall, do you have any questions

1    from me of any specific recommendations to put in the judgment?

2              MR. BIRDSALL:  I can't think of anything right now.

3              THE COURT:  Okay.  Do you have your request in terms

4    of placement or treatment?

5              MR. BIRDSALL:  Well, I'd like to have him be

6    considered for treatment.  I think there's a 500 hour program.

7              THE COURT:  RDAP.

8              MR. BIRDSALL:  And then to the extent that the Bureau

9    of Prisons will honor a request to be as close to his family

10   members as possible.  I don't know if that would be here or some

11   place else as close to Milwaukee.  So, why, either -- whichever

12   facility is closest to either here or Connecticut.

13             THE COURT:  I think it is the District of Connecticut.

14   I'll put either Eastern District of Wisconsin or District of

15   Connecticut.  Mr. Pagan, you do have the right, as you know

16   you've already mentioned it, to appeal both your conviction and

17   the sentence that I imposed today.  I suspect I don't need to

18   tell you this because you already know that you're going to

19   appeal.  But just so you're aware, Mr. Birdsall has to file your

20   notice of appeal within two weeks or 14 days of the date that I

21   issue the written judgment.  I won't be able to do that today,

22   so it will probably be a couple days from now.  But once that

23   written judgment comes out, Mr. Birdsall will file your notice

24   of appeal within 14 days.  So I'm sure you've already talked

25   with him about it, but if there's any question that you have or

1  anything you want to talk to him about, make sure to do that

2  within those 14 days so that he has time to take the action that

3  you want him to take.

4          Mr. Gonzales, is there anything further that we need

5  to do today from the Government's perspective?

6          MG. GONZALES:  No, Your Honor.

7          THE COURT:  Ms. Morgan, anything from probation?

8          PROBATION AGENT:  No, Your Honor.

9          THE COURT:  Mr. Birdsall, anything else from the

10  defense?

11          MR. BIRDSALL:  Nothing.

12          THE COURT:  All right.  Thank you everyone.

13          MR. BIRDSALL:  Thank you.

14      (Whereupon proceeding was concluded.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.


Signed and Certified May 24, 2019.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov

83